PENNSYLVANIA DEPARTMENT OF PUBLIC
WELFARE ET AL. *v.* DAVENPORT ET UX.

No. 89–156.   Argued February 20, 1990—Decided May 29, 1990

MARSHALL, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and BRENNAN, WHITE, STEVENS, SCALIA, and KENNEDY, JJ., joined. BLACKMUN, J., filed a dissenting opinion, in which O'CONNOR, J., joined, *post*, p. 564.

*Walter W. Cohen*, First Deputy Attorney General of Pennsylvania, argued the cause for petitioners. With him on the briefs were *Ernest D. Preate, Jr.*, Attorney General, *John G. Knorr III*, Chief Deputy Attorney General, *Calvin R. Koons*, Senior Deputy Attorney General, and *Mary Benefield Seiverling*, Deputy Attorney General.

*David A. Searles* argued the cause for respondents. With him on the briefs were *Eric L. Frank* and *Henry J. Sommer.*\*

---

\*Briefs of *amici curiae* urging reversal were filed for the United States by *Solicitor General Starr, Assistant Attorneys General Dennis* and *Gerson, Deputy Solicitor General Roberts,* and *Stephen L. Nightingale;* for the State of Alabama et al. by *Mary Sue Terry,* Attorney General of Virginia, *H. Lane Kneedler,* Chief Deputy Attorney General, *Walter A. McFarlane,* Deputy Attorney General, and *Jeffrey A. Spencer,* Assistant Attorney General, *Don Siegelman,* Attorney General of Alabama, *Robert K. Corbin,* Attorney General of Arizona, *John K. Van de Kamp,* Attorney General of California, *Clarine Nardi Riddle,* Acting Attorney General of Connecticut, and *John J. Kelly,* Chief States Attorney, *Charles M. Oberly III,* Attorney General of Delaware, *Robert A. Butterworth,* Attorney General of Florida, *James T. Jones,* Attorney General of Idaho, *Neil F. Hartigan,* Attorney General of Illinois, *Linley E. Pearson,* Attorney General of Indiana, *Thomas J. Miller,* Attorney General of Iowa, *Robert T. Stephan,* Attorney General of Kansas, *Frederic J. Cowan,* Attorney General of Kentucky, *William J. Guste, Jr.,* Attorney General of Louisiana, *James E. Tierney,* Attorney General of Maine, *James M. Shannon,* Attorney General of Massachusetts, *J. Joseph Curran, Jr.,* Attorney General of Maryland, *Frank J. Kelley,* Attorney General of Michigan, *Hubert H. Humphrey III,* Attorney General of Minnesota, *William L. Webster,* Attorney General of Missouri, *Marc Racicot,* Attorney General of Montana, *John P. Arnold,* Attorney General of New Hampshire, *Peter N. Perretti, Jr.,* Attorney General of New Jersey, *Hal Stratton,* Attorney General of New Mexico, *Lacy H. Thornburg,* Attorney General of North

JUSTICE MARSHALL delivered the opinion of the Court.

In *Kelly* v. *Robinson*, 479 U. S. 36, 50 (1986), this Court held that restitution obligations imposed as conditions of probation in state criminal actions are nondischargeable in proceedings under Chapter 7 of the Bankruptcy Code, 11 U. S. C. § 701 *et seq.* The Court rested its holding on its interpretation of the Code provision that protects from discharge any debt that is "a fine, penalty, or forfeiture payable to and for the benefit of a governmental unit, and is not compensation for actual pecuniary loss." § 523(a)(7). Because the Court determined that restitution orders fall within § 523(a)(7)'s exception to discharge, it declined to reach the question whether restitution orders are "debt[s]" as defined by § 101(11) of the Code. In this case, we must decide whether restitution obligations are dischargeable debts in proceedings under Chapter 13, § 1301 *et seq.* The exception to discharge relied on in *Kelly* does not extend to Chapter 13. We conclude, based on the language and structure of the Code, that restitution obligations are "debt[s]" as defined by § 101(11). We therefore hold that such payments are dischargeable under Chapter 13.

## I

In September 1986, respondents Edward and Debora Davenport pleaded guilty in a Pennsylvania court to welfare

Carolina, *Nicholas J. Spaeth*, Attorney General of North Dakota, *Anthony. Celebrezze, Jr.*, Attorney General of Ohio, *Dave Frohnmayer*, Attorney General of Oregon, *Jorge E. Perez-Diaz*, Solicitor General of Puerto Rico, *T. Travis Medlock*, Attorney General of South Carolina, *Roger A. Tellinghuisen*, Attorney General of South Dakota, *Charles W. Burson*, Attorney General of Tennessee, *R. Paul Van Dam*, Attorney General of Utah, *Jeffrey L. Amestoy*, Attorney General of Vermont, *Godfrey R. de Castro*, Attorney General of the Virgin Islands, and *Joseph B. Meyer*, Attorney General of Wyoming; for the Council of State Governments et al. by *Benna Ruth Solomon* and *Thomas D. Goldberg;* and for the Washington Legal Foundation et al. by *Daniel J. Popeo, Paul D. Kamenar,* and *Richard A. Samp.*

fraud and were sentenced to one year's probation. As a condition of probation, the state court ordered the Davenports to make monthly restitution payments to the county probation department, which in turn would forward the payments to the Pennsylvania Department of Public Welfare, the victim of the Davenports' fraud. Pennsylvania law mandates restitution of welfare payments obtained through fraud, Pa. Stat. Ann., Tit. 62, § 481(c) (Purdon Supp. 1989), and directs the probation section to "forward to the victim the property or payments made pursuant to the restitution order," 18 Pa. Cons. Stat. § 1106(e) (1988).

In May 1987, the Davenports filed a petition under Chapter 13 in the United States Bankruptcy Court for the Eastern District of Pennsylvania. In their Chapter 13 statement, they listed their restitution obligation as an unsecured debt payable to the Department of Public Welfare. Soon thereafter, the Adult Probation and Parole Department of Bucks County (Probation Department) commenced a probation violation proceeding, alleging that the Davenports had failed to comply with the restitution order. The Davenports informed the Probation Department of the pending bankruptcy proceedings and requested that the Department withdraw the probation violation charges until the bankruptcy issues were settled. The Probation Department refused, and the Davenports filed an adversary action in Bankruptcy Court seeking both a declaration that the restitution obligation was a dischargeable debt and an injunction preventing the Probation Department from undertaking any further efforts to collect on the obligation.

While the adversary action was pending, the Bankruptcy Court confirmed the Davenports' Chapter 13 plan without objection from any creditor.[1] Although notified of the

---

[1] The Davenports subsequently fulfilled their obligations under the plan and received a discharge pursuant to 11 U. S. C. § 1328(a), which provides: "As soon as practicable after completion by the debtor of all payments under the plan, unless the court approves a written waiver of discharge

proceedings, neither the Probation Department nor the Department of Public Welfare filed a proof of claim in the bankruptcy action. Meanwhile, the Probation Department proceeded in state court on its motion to revoke probation. Although the court declined to revoke the Davenports' probation and extended their payment period, it nonetheless ruled that its restitution order remained in effect.

The Bankruptcy Court subsequently held that the Davenports' restitution obligation was an unsecured debt dischargeable under 11 U. S. C. § 1328(a). 83 B. R. 309 (ED Pa. 1988). On appeal, the District Court reversed, holding that state-imposed criminal restitution obligations cannot be discharged in a Chapter 13 bankruptcy. 89 B. R. 428 (ED Pa. 1988). The District Court emphasized the federalism concerns that are implicated when federal courts intrude on state criminal processes, *id.*, at 430, and relied substantially on dicta in *Kelly, supra,* at 50, where the Court expressed "serious doubts whether Congress intended to make criminal penalties 'debts'" under the Code. The Court of Appeals for the Third Circuit reversed, concluding that "the plain language of the chapter" demonstrated that restitution orders are debts within the meaning of the Code and hence dischargeable in proceedings under Chapter 13. *In re Johnson-Allen,* 871 F. 2d 421, 428 (1989).

To address a conflict among Bankruptcy Courts on this issue,[2] we granted certiorari, 493 U. S. 808 (1989).

## II

Our construction of the term "debt" is guided by the fundamental canon that statutory interpretation begins with the

---

executed by the debtor after the order for relief under this chapter, the court shall grant the debtor a discharge of all debts provided for by the plan or disallowed under section 502 of this title." The section contains two exceptions that the parties agree are not applicable to this case.

[2] Compare, *e. g., In re Kohr,* 82 B. R. 706, 712 (MD Pa. 1988) (restitution obligations are not "debts" within the meaning of the Code), with *In re Cullens,* 77 B. R. 825, 828 (Colo. 1987) (restitution orders are "debts").

language of the statute itself. *Landreth Timber Co.* v. *Landreth,* 471 U. S. 681, 685 (1985). Section 101(11) of the Bankruptcy Code defines "debt" as a "liability on a claim." This definition reveals Congress' intent that the meanings of "debt" and "claim" be coextensive. See also H. R. Rep. No. 95–595, p. 310 (1977); S. Rep. No. 95–989, p. 23 (1978). Thus, the meaning of "claim" is crucial to our analysis. A "claim" is a *"right to payment,* whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 11 U. S. C. § 101(4)(A) (emphasis added). As is apparent, Congress chose expansive language in both definitions relevant to this case. For example, to the extent the phrase "right to payment" is modified in the statute, the modifying language ("whether or not such right is . . .") reflects Congress' broad rather than restrictive view of the class of obligations that qualify as a "claim" giving rise to a "debt." See also H. R. Rep. No. 95–595, *supra,* at 309 (describing definition of "claim" as "broadest possible" and noting that Code "contemplates that all legal obligations of the debtor . . . will be able to be dealt with in the bankruptcy case"); accord, S. Rep. No. 95–989, *supra,* at 22.

Petitioners maintain that a restitution order is not a "right to payment" because neither the Probation Department nor the victim stands in a traditional creditor-debtor relationship with the criminal offender. In support of this position, petitioners refer to *Kelly's* discussion of the special purposes of punishment and rehabilitation underlying the imposition of restitution obligations. 479 U. S., at 52. Petitioners also emphasize that restitution orders are enforced differently from other obligations that are considered "rights to payment."

In *Kelly,* the Court decided that restitution orders fall within 11 U. S. C. § 523(a)(7)'s exception to discharge provision, which protects from discharge any debt "to the extent

such debt is for a fine, penalty, or forfeiture payable to and for the benefit of a governmental unit, and is not compensation for actual pecuniary loss." In reaching that conclusion, the Court necessarily found that such orders are "not compensation for actual pecuniary loss." Rather, "[b]ecause criminal proceedings focus on the State's interests in rehabilitation and punishment," the Court held that "restitution orders imposed in such proceedings operate 'for the benefit of' the State" and not "'for . . . compensation' of the victim." 479 U. S., at 53.

Contrary to petitioners' argument, however, the Court's prior characterization of the purposes underlying restitution orders does not bear on our construction of the phrase "right to payment" in § 101(4)(A). The Court in *Kelly* analyzed the purposes of restitution in construing the qualifying clauses of § 523(a)(7), which explicitly tie the application of that provision to the purpose of the compensation required. But the language employed to define "claim" in § 101(4)(A) makes no reference to purpose. The plain meaning of a "right to payment" is nothing more nor less than an enforceable obligation, regardless of the objectives the State seeks to serve in imposing the obligation.

Nor does the State's method of enforcing restitution obligations suggest that such obligations are not "claims." Although neither the Probation Department nor the victim can enforce restitution obligations in civil proceedings, *Commonwealth* v. *Mourar*, 349 Pa. Super. 583, 603, 504 A. 2d 197, 208 (1986), vacated and remanded on other grounds, 517 Pa. 83, 534 A. 2d 1050 (1987), the obligation is enforceable by the substantial threat of revocation of probation and incarceration. That the Probation Department's enforcement mechanism is criminal rather than civil does not alter the restitution order's character as a "right to payment." Indeed, the right created by such an order made as a condition of probation is in some sense greater than the right conferred by an ordinary civil obligation, because it is secured by the debtor's freedom

rather than his property. Accordingly, we do not regard the purpose or enforcement mechanism of restitution orders as placing such orders outside the scope of § 101(4)(A).

### III

Moving beyond the language of § 101, the United States, appearing as *amicus* in support of petitioners, contends that other provisions in the Code, particularly the exemption to the automatic stay provision, § 362(b)(1), and Chapter 7's distribution of claims provision, § 726, reflect Congress' intent to exempt restitution orders from discharge under Chapter 13. We are not persuaded, however, that the language or the structure of the Code as a whole supports that conclusion.

Section 362(a) automatically stays a wide array of collection and enforcement proceedings against the debtor and his property.[3] Section 362(b)(1) exempts from the stay "the commencement or continuation of a criminal action or proceeding against the debtor." According to the Senate Report, the exception from the automatic stay ensures that "[t]he bankruptcy laws are not a haven for criminal offenders." S. Rep. No. 95–989, *supra*, at 51. Section 362(b)(1) does not, however, explicitly exempt governmental efforts to collect restitution obligations from a debtor. Cf. 11 U. S. C. § 362(b)(2) ("collection of alimony, maintenance, or support" is not barred by the stay). Nonetheless, the United States argues that it would be anomalous to construe the Code as eliminating a haven for criminal offenders under the automatic stay provision while granting them sanctuary from restitution obligations under Chapter 13.

We find no inconsistency in these provisions. Section 362(b)(1) ensures that the automatic stay provision is not construed to bar federal or state prosecution of alleged criminal

---

[3] Although the automatic stay protects a debtor from various collection efforts over a specified period, it does not extinguish or discharge any debt. See generally 1 W. Norton, Bankruptcy Law and Practice §§ 20.04–20.36 (1986 and Supp. 1989).

offenses. It is not an irrational or inconsistent policy choice to permit prosecution of criminal offenses during the pendency of a bankruptcy action and at the same time to preclude probation officials from enforcing restitution orders while a debtor seeks relief under Chapter 13. Congress could well have concluded that maintaining criminal prosecutions during bankruptcy proceedings is essential to the functioning of government but that, in the context of Chapter 13, a debtor's interest in full and complete release of his obligations outweighs society's interest in collecting or enforcing a restitution obligation outside the agreement reached in the Chapter 13 plan.

The United States' reliance on § 726 is likewise unavailing. That section establishes the order in which claims are settled under Chapter 7. Section 726(a)(4) assigns a low priority to "any allowed claim, whether secured or unsecured, for any fine, penalty, or forfeiture . . . to the extent that such fine, penalty, forfeiture, or damages are not compensation for actual pecuniary loss suffered by the holder of such claim." The United States argues that the phrase "fine, penalty, or forfeiture" should be construed to apply only to *civil* fines, penalties, and forfeitures, and not to *criminal* restitution obligations. Otherwise, State and Federal Governments will receive disfavored treatment relative to other creditors both in Chapter 7 and Chapter 13 proceedings, see § 1325(a)(4) (a Chapter 13 plan must ensure that unsecured creditors receive no worse treatment than they would under Chapter 7), a result the United States regards as anomalous given the strength of the governmental interest in collecting restitution payments.

The central difficulty with the United States' construction of § 726(a)(4) is that it conflicts with *Kelly*'s holding that § 523(a)(7), the exception to discharge provision, applies to *criminal* restitution obligations. 479 U. S., at 51 (§ 523(a)(7) "creates a broad exception for all penal sanctions"). The United States acknowledges that the phrase "fine, penalty,

or forfeiture" as it appears in § 726(a)(4) must have the same meaning as in § 523(a)(7). We are unwilling to revisit *Kelly*'s determination that § 523(a)(7) "protects traditional *criminal* fines [by] codif[ying] the judicially created exception to discharge for fines." *Ibid.* (emphasis added). Thus, we reject the view that §§ 523(a)(7) and 726(a)(4) implicitly refer only to *civil* fines and penalties.[4]

The United States' position here highlights the tension between *Kelly*'s interpretation of § 523(a)(7) and its dictum suggesting that restitution obligations are not "debts." See *supra*, at 557. As stated above, *Kelly* found explicitly that § 523(a)(7) "codifies the judicially created exception to discharge" for both civil and criminal fines. 479 U. S., at 51. Had Congress believed that restitution obligations were not "debts" giving rise to "claims," it would have had no reason to except such obligations from discharge in § 523(a)(7). Given *Kelly*'s interpretation of § 523(a)(7), then, it would be anomalous to construe "debt" narrowly so as to exclude criminal restitution orders. Such a narrow construction of "debt" necessarily renders § 523(a)(7)'s codification of the judicial exception for criminal restitution orders mere surplusage. Our cases express a deep reluctance to interpret a statutory provision so as to render superfluous other provisions in the same enactment. See, *e. g., Mackey* v. *Lanier Collection Agency & Service, Inc.*, 486 U. S. 825, 837 (1988).

Moreover, in locating Congress' policy choice regarding the dischargeability of restitution orders in § 523(a)(7), *Kelly* is faithful to the language and structure of the Code: Congress defined "debt" broadly and took care to except particular debts from discharge where policy considerations so war-

---

[4] In any event, the Government's contention that Congress must have intended to favor criminal, as opposed to civil, claims held by the government is unsubstantiated. The United States' view about the wisdom of this policy choice, unsupported by any textual authority that Congress in fact adopted such a policy, is an inadequate basis for rejecting the statute's broad definition of "debt." See *supra*, at 557–558.

ranted. Accordingly, Congress secured a broader discharge for debtors under Chapter 13 than Chapter 7 by extending to Chapter 13 proceedings some, but not all, of § 523(a)'s exceptions to discharge. See 5 Collier on Bankruptcy ¶ 1328.01 [1][c] (15th ed. 1986) ("[T]he dischargeability of debts in chapter 13 that are not dischargeable in chapter 7 represents a policy judgment that [it] is preferable for debtors to attempt to pay such debts to the best of their abilities over three years rather than for those debtors to have those debts hanging over their heads indefinitely, perhaps for the rest of their lives") (footnote omitted). Among those exceptions that Congress chose *not* to extend to Chapter 13 proceedings is § 523(a)(7)'s exception for debts arising from a "fine, penalty, or forfeiture." Thus, to construe "debt" narrowly in this context would be to override the balance Congress struck in crafting the appropriate discharge exceptions for Chapter 7 and Chapter 13 debtors.

## IV

Our refusal to carve out a broad judicial exception to discharge for restitution orders does not signal a retreat from the principles applied in *Kelly*. We will not read the Bankruptcy Code to erode past bankruptcy practice absent a clear indication that Congress intended such a departure. *Kelly*, *supra*, at 47 (citing *Midlantic National Bank* v. *New Jersey Dept. of Environmental Protection*, 474 U. S. 494 (1986)). In *Kelly*, the Court examined pre-Code practice and identified a general reluctance "to interpret federal bankruptcy statutes to remit state criminal judgments." 479 U. S., at 44. This pre-Code practice informed the Court's conclusion that § 523(a)(7) broadly applies to all penal sanctions, including criminal fines. Here, on the other hand, the statutory language plainly reveals Congress' intent not to except restitution orders from discharge in certain Chapter 13 proceedings. This intent is clear from Congress' decision to limit the exceptions to discharge applicable to Chapter 13, § 1328(a), as

well as its adoption of the "broadest possible" definition of "debt" in § 101(11). See *supra*, at 558.

Nor do we conclude lightly that Congress intended to interfere with States' administration of their criminal justice systems. *Younger* v. *Harris*, 401 U. S. 37, 46 (1971). As the Court stated in *Kelly*, permitting discharge of criminal restitution obligations may hamper the flexibility of state criminal judges in fashioning appropriate sentences and require state prosecutors to participate in federal bankruptcy proceedings to safeguard state interests. 479 U. S., at 49. Certainly the legitimate state interest in avoiding such intrusions is not lessened simply because the offender files under Chapter 13 rather than Chapter 7. Nonetheless, the concerns animating *Younger* cannot justify rewriting the Code to avoid federal intrusion. Where, as here, congressional intent is clear, our sole function is to enforce the statute according to its terms.

## V

Restitution obligations constitute debts within the meaning of § 101(11) of the Bankruptcy Code and are therefore dischargeable under Chapter 13. The decision of the Court of Appeals is affirmed.

*It is so ordered.*

JUSTICE BLACKMUN, with whom JUSTICE O'CONNOR joins, dissenting.

The Court today concludes that Congress intended an obligation to pay restitution imposed as part of a state criminal sentence to be a "debt" within the meaning of the United States Bankruptcy Code. Because Congress has given no clear indication that it intended to abrogate the long "history of bankruptcy court deference to criminal judgments," *Kelly* v. *Robinson*, 479 U. S. 36, 44 (1986), and because there is no suggestion in the Bankruptcy Code that it may be used as a shield to protect a criminal from punishment for his crime, I must disagree.

This Court carefully has set forth a method for statutory analysis of the Bankruptcy Code. See *Kelly, supra;* see also *Midlantic National Bank* v. *New Jersey Dept. of Environmental Protection,* 474 U. S. 494 (1986). When analyzing a bankruptcy statute, the Court, of course, looks to its plain language. But the Court has warned against an overly literal interpretation of the Bankruptcy Code. " '[W]e must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy.' " *Kelly,* 479 U. S., at 43, quoting, as have other opinions of this Court, *United States* v. *Heirs of Boisdoré,* 8 How. 113, 122 (1849). The strict language of the Bankruptcy Code does not control, even if the statutory language has a "plain" meaning, if the application of that language "will produce a result demonstrably at odds with the intention of its drafters." *United States* v. *Ron Pair Enterprises, Inc.,* 489 U. S. 235, 242 (1989). To determine the drafters' intent, the Court presumes that Congress intended to keep continuity between pre-Code judicial practice and the enactment of the Bankruptcy Code in 1978. *Midlantic,* 474 U. S., at 501. For me, the statutory language, the consistent authority treating criminal sanctions as nondischargeable under the Bankruptcy Act of 1898, the absence of any legislative history suggesting that the Code was intended to change that established principle, and the strong policy of deference to state criminal judgments all compel the conclusion that a restitution order is not a dischargeable debt.

The majority appropriately begins its analysis with the language of the statute. As the majority points out, the Bankruptcy Code defines "debt" as a "liability on a claim." 11 U. S. C. § 101 (11). The term "claim," in turn, is defined as a "right to payment." § 101(4)(A). The question then becomes whether it is clear from the statutory language alone that a restitution order is a "right to payment," or whether the statutory language, "at least to *some degree,* [is] open to interpretation." *Ron Pair,* 489 U. S., at 245–246 (emphasis

added). The majority simply asserts that the plain meaning of "right to payment" is an "enforceable obligation," which gives a restitution order the "character" of a "right to payment." *Ante*, at 559. I cannot accept this easy conclusion.

Some time ago, Justice Frankfurter pointed out: "The notion that because the words of a statute are plain, its meaning is also plain, is merely pernicious oversimplification." *United States* v. *Monia*, 317 U. S. 424, 431 (1943) (dissenting opinion). This observation rings especially true in this case. It is not at all clear to me that the words "right to payment" plainly include an obligation resulting from a criminal restitution order. While the words may be of common usage, their meaning is not at all plain in this context. Notably absent from the Code's definition (and from the legislative history) of both "debt" and "claim" is any indication that Congress intended the discharge provisions to extend into the criminal sphere. Indeed, there are persuasive reasons for excluding criminal restitution from the category of "debts." Petitioners argue—not without force—that a criminal restitution order is not a "right to payment" because neither the victim of the crime nor the Probation Department possesses a right to payment of a restitution order. Brief for Petitioners 22. Petitioners also argue that because the victim has no right of enforcement, the victim has no right to payment. *Id.*, at 27; see also *Commonwealth* v. *Mourar*, 349 Pa. Super. 583, 603, 504 A. 2d 197, 208 (1986) (if criminal defendant fails to make restitution as ordered, victim has no right of enforcement), vacated and remanded on other grounds, 517 Pa. 83, 534 A. 2d 1050 (1987); cf. *Bearden* v. *Georgia*, 461 U. S. 660 (1983) (state court cannot constitutionally revoke probation for failure to pay a fine and make restitution without first determining the probationer's ability to pay). Several Bankruptcy Courts have agreed with petitioners and have decided that the definition of "debt" in the Bankruptcy Code does *not* include a criminal restitution order. See, *e. g.*, *In re Norman*, 95 B. R. 771, 773, and n. 3 (Colo. 1989) (criminal penalties

and fines are not "debt[s]" as defined under § 101(11) of the Code; because crime victim has no "right to payment," restitution is not a "debt"); *In re Pellegrino*, 42 B. R. 129, 132 (Conn. 1984) (since "crime victim has no 'right to payment,' restitution is not a 'debt' under Bankruptcy Code § 101(11)"; *In re Magnifico*, 21 B. R. 800 (Ariz. 1982) (criminal restitution not a "debt" contemplated by Bankruptcy Code); *In re Button*, 8 B. R. 692, 694 (WDNY 1981) ("From these definitions [of 'debt,' '[c]laim,' and '[c]reditor'], it does not appear that restitution could be considered a debt"); accord, *In re Kohr*, 82 B. R. 706, 712 (MD Pa. 1988); *In re Oslager*, 46 B. R. 58 (MD Pa. 1985); *In re Mead*, 41 B. R. 838 (Conn. 1984). Other Bankruptcy Courts, to be sure, have determined that the definition of "debt" does include restitution obligations. See, *e. g., In re Vandrovec*, 61 B. R. 191 (N. D. 1986). At the least, these varied interpretations of the Code by bankruptcy judges are evidence that the phrase "right to payment," when applied to restitution orders, is "subject to interpretation." *Kelly*, 479 U. S., at 50. The statute, on its face, is not self-defining and surely does not compel the result that criminal restitution orders constitute "debts."

My conclusion that the majority errs in concluding that the words "right to payment" include restitution orders is supported by the fact that such an interpretation would produce a result "'demonstrably at odds with the intention of its drafters.'" *Ron Pair*, 489 U. S., at 244, quoting *Griffin* v. *Oceanic Contractors, Inc.*, 458 U. S. 564, 571 (1982). This Court has declared that, to effectuate Congress' intent in enacting the Code, we must consider the language of § 101 "in light of the history of bankruptcy court deference to criminal judgments and in light of the interests of the States in unfettered administration of their criminal justice systems." *Kelly*, 479 U. S., at 44. That deference was reflected in the judicial interpretation of the discharge provisions of the Bankruptcy Act of 1898, ch. 541, 30 Stat. 544. In *Kelly*, the Court discussed at length the customary pre-Code practice of

holding that criminal monetary sanctions were not dischargeable in bankruptcy. See 479 U. S., at 44–45. The Court explained that the new Code was enacted in 1978 to replace the 1898 Act and noted: "The treatment of criminal judgments under the Act of 1898 informs our understanding of the language of the Code." *Id.*, at 44.

Because Congress' presumed intent is to preserve pre-Code piactice unless it specifically indicates otherwise, we must first consider the treatment of criminal restitution orders under the 1898 Act. That Act established two categories of debts, those that were "allowable" and those that were "provable." "Only if a debt was allowable could the creditor receive a share of the bankrupt's assets." *Ibid.*, citing § 65a. Only provable debts were dischargeable. See § 17. The Court in *Kelly* explained that penalties or forfeitures owed to governmental entities generally were not allowable, § 57j; but the Act failed to state that such debts were not provable. See § 63. Given this statutory scheme, "[t]he most natural construction of the Act, therefore, would have allowed criminal penalties to be discharged in bankruptcy, even though the government was not entitled to a share of the bankrupt's estate." 479 U. S., at 44–45. Nonetheless, courts consistently "refused to allow a discharge in bankruptcy to affect the judgment of a state criminal court." *Id.*, at 45. See, *e. g.*, *In re Abramson*, 210 F. 878, 880 (CA2 1914) ("[J]udgments for penalties are not debts which can be proved or allowed as such because they are not for a fixed liability"); cf. *In re Alderson*, 98 F. 588 (W. Va. 1899) (the only federal-court decision found by the *Kelly* Court that allowed a discharge to affect a sentence imposed by a state criminal court). In fact, the judicially created exception to discharge was "so widely accepted by the time Congress enacted the new Code that a leading commentator could state flatly that 'fines and penalties are not affected by a discharge.'" *Kelly*, 479 U. S., at 46, quoting 1A Collier on Bankruptcy ¶ 17.13, pp. 1609–1610, and n. 10 (14th ed. 1978).

Those courts addressing criminal restitution orders "applied the same reasoning to prevent a discharge in bankruptcy from affecting such a condition of a criminal sentence." 479 U. S., at 46. As a result, when Congress enacted the Bankruptcy Code in 1978, there existed an "established judicial exception to discharge for criminal sentences, including restitution orders." *Ibid.* See also *Zwick* v. *Freeman,* 373 F. 2d 110, 116 (CA2 1967) ("[G]overnmental sanctions are not regarded as debts even when they require monetary payments"). Because criminal sanctions were not dischargeable, they were also not "provable," as the two terms tended to merge in pre-Code practice. See Collier, *supra,* at ¶ 17.05, p. 1587 (pre-Code practice held that "[f]ines for violation of law, and forfeitures, are not provable [for purposes of § 63], and, therefore, not dischargeable" (footnotes omitted)).

Thus, under the 1898 Act, criminal monetary sanctions were not allowable, provable, or dischargeable in bankruptcy. In functional terms, criminal monetary sanctions were not "debts" for the purpose of pre-Code bankruptcy proceedings. This judicially created pre-Code practice "reflected policy considerations of great longevity and importance," that is, "'a deep conviction that federal bankruptcy courts should not invalidate the results of state criminal proceedings.'" *Ron Pair,* 489 U. S., at 245, quoting *Kelly,* 479 U. S., at 47.

In the face of such a longstanding principle, "a court must determine whether Congress has expressed an intent to change the interpretation of a judicially created concept in enacting the Code." *Ibid.* The Court stated in *Midlantic:* "The normal rule of statutory construction is that if Congress intends for legislation to change the interpretation of a judicially created concept, it makes that intent specific." 474 U. S., at 501. There is no indication that Congress had any intent so drastically to change the established pre-Code practice regarding criminal sanctions. Although the Bankruptcy

Code definition of "debt" is a broad one, "nothing in the legislative history [of the Bankruptcy Code provisions] compels the conclusion that Congress intended to change the state of the law with respect to criminal judgments." *Kelly*, 479 U. S., at 50, n. 12; see also *Midlantic* (despite Code language that the dissent labeled "absolute in its terms," 474 U. S., at 509, the Court refused to find that Congress had implicitly abrogated a judicially created pre-Code limitation on abandonment powers). Indeed, "[i]n light of the established state of the law—that bankruptcy courts could not discharge criminal judgments," the *Kelly* Court expressed "serious doubts whether Congress intended to make criminal penalties 'debts' within the meaning of § 101(4)." 479 U. S., at 50. If Congress had intended such a radical change, surely it would have spoken more clearly. In my view, Congress' attitude towards criminal sanctions is most clearly indicated in the statement that "[t]he bankruptcy laws are not a haven for criminal offenders." H. R. Rep. No. 95–595, p. 342 (1977) (discussing automatic stay provisions).

The majority today brushes aside the rule of statutory construction outlined by this Court—a rule the Court has stressed must be used with "*particular care* in construing the scope of bankruptcy codifications." *Midlantic*, 474 U. S., at 501 (emphasis added). The majority insists that its holding does not signal a retreat from the principles applied in *Kelly* because there is a "*clear indication*" that Congress intended to depart from past bankruptcy practice. *Ante*, at 563 (emphasis added). The majority contends that Congress made that intent "clear" by its "adoption of the 'broadest possible' definition of 'debt.'" *Ante*, at 564. I disagree. And I am puzzled by the majority's position because the Court previously has rejected it expressly. See *Kelly*, 479 U. S., at 50, n. 12 (although the definition of "debt" was broadened, "nothing in the legislative history of these sections compels the conclusion that Congress intended to change the state of the law with respect to criminal judgments"). Moreover, it seems

more likely that the broader definition was enacted simply to redress the problems created by the restrictive definitions of "allowable" and "provable" claims under the Act that made it impossible for some debtors to resolve all their civil liabilities in bankruptcy. Of particular concern were contingent and unliquidated claims that were "nonprovable" under the Act:

> "[U]nder the liquidation chapters of the Bankruptcy Act, certain creditors are not permitted to share in the estate because of the non-provable nature of their claims, and the debtor is not discharged from those claims. Thus, relief for the debtor is incomplete, and those creditors are not given an opportunity to collect in the case on their claims. The proposed law will permit complete settlement of the affairs of a bankrupt debtor, and a complete discharge and fresh start." H. R. Rep. No. 95–595, *supra*, at 180 (footnote omitted).

The statutory language itself highlights this approach. The Code's definition of "claim" includes any right to payment that is "unliquidated," "contingent," "unmatured," or "disputed," 11 U. S. C. § 101(4)(A), but does not include any modifier that in any way suggests the incorporation of criminal sanctions.

The majority's assertion that Congress' enactment of § 523 (a)(7) evidences a "clear indication" to abrogate pre-Code rulings that criminal sanctions were neither provable nor dischargeable in bankruptcy is similarly unconvincing. Under § 523(a)(7), a debt is not dischargeable "to the extent such debt is for a fine, penalty, or forfeiture payable to and for the benefit of a governmental unit, and is not compensation for actual pecuniary loss, other than a tax penalty." § 523(a)(7). The majority reasons that if restitution obligations were not debts, there would be no need to except them from discharge; therefore, it says, Congress clearly intended that criminal restitution orders be considered debts. Because § 523(a)(7) does not apply to all Chapter 13 proceedings, the majority contends that criminal restitution obligations should be con-

sidered dischargeable debts under Chapter 13. *Ante*, at 562–563. Again, I disagree. The enactment of this single provision of the Bankruptcy Code does little to demonstrate clear congressional intent to change traditional pre-Code practice. Even if § 523(a)(7) can be interpreted as making criminal restitution orders not dischargeable, this does not mean that Congress intended to make criminal restitution orders debts. Under pre-Code practice, nondischargeability of a criminal restitution order would be evidence that it was not a debt at all. Congress gave no indication that it intended to break with this pre-Code conception of dischargeability when it enacted § 523(a)(7).

In addition, pre-Code Chapter XIII essentially adopted Chapter VII discharge policy, excepting from discharge all debts that were not dischargeable under Chapter VII when those debts were held by creditors who had not accepted the bankruptcy plan. See § 60 of the Act. Congress' failure to include a parallel provision to § 523(a)(7) in Chapter 13, far from demonstrating a clear intent to make fines dischargeable in Chapter 13, is more likely a carryover from pre-Code practice, where Chapter XIII relied on Chapter VII's discharge provisions. "If Congress had intended, by § 523(a)(7) or by any other provision," to change the pre-Code practice of holding monetary sanctions not allowable, provable, or dischargeable in bankruptcy, "'we can be certain that there would have been hearings, testimony, and debate concerning consequences so wasteful, so inimical to purposes previously deemed important, and so likely to arouse public outrage.'" *Kelly*, 479 U. S., at 51, quoting Powell, J., dissenting, in *TVA* v. *Hill*, 437 U. S. 153, 209 (1978).

I do not believe that Congress so cavalierly would have disregarded the States' overwhelmingly important interest in administering their criminal justice systems free from the interference of a federal bankruptcy judge. Every State and the District of Columbia presently authorize the use of restitution orders. See Note, Criminal Restitution as a Limited

Opportunity, 13 New Eng. J. on Crim. & Civ. Confinement 243–244, n. 9 (1987). A bankruptcy court discharge of a criminal restitution order is a deep intrusion by the federal courts into the State's sovereign power. It vacates a criminal sentence that has presumably been entered in full accord with all substantive and procedural mandates of the Constitution. I seriously doubt that "Congress lightly would limit the rehabilitative and deterrent options available to state criminal judges." *Kelly*, 479 U. S., at 49.

The majority's decision today will have an adverse effect on the sentencing process. The judgment of sentencing courts and legislators that rehabilitation is the most effective form of punishment will be tempered by the knowledge that convicted criminals easily may avoid a sentence requiring restitution merely by obtaining a Chapter 13 discharge. Sentencing courts will be faced with a dilemma. The sentencing judge must either risk that a federal bankruptcy judge will undermine a restitution order, thus absolving the convicted criminal from punishment, or impose a harsher and less appropriate term of imprisonment, a sentence that the federal bankruptcy court will be unable to undermine. Congress surely would not have enacted legislation with such an extraordinary result without at least some discussion of its consequences.

The majority's holding turns *Kelly* around. The *Kelly* Court stressed this compelling federalism concern, terming it "one of the most powerful of the considerations that should influence a court considering equitable types of relief," and recognized that it "must influence our interpretation of the Bankruptcy Code." 479 U. S., at 49. The Court was concerned that "federal remission of judgments imposed by state criminal judges . . . would hamper the flexibility of state criminal judges in choosing the combination of imprisonment, fines, and restitution most likely to further the rehabilitative and deterrent goals of state criminal justice systems." *Ibid.* The concerns of the *Kelly* Court are no less applicable in this

case. Congress' intent to invalidate the results of state criminal proceedings is far from clear. There is simply no suggestion that Congress intended to depart from pre-Code practice and encroach so deeply upon the States' administration of their criminal justice systems. In the absence of evidence of congressional intent to the contrary, the statutory construction rule set forth in *Kelly* and *Midlantic* requires a determination that the Bankruptcy Code does not permit convicted criminals to discharge their restitution obligations in Chapter 13 proceedings. I would therefore refuse to allow the Bankruptcy Code to become a sanctuary for a criminal trying to avoid the punishment meted out by a state-court judge.

I dissent.