## In re PRINCETON SQUARE ASSOCIATES, L.P., a/k/a Princeton–Windsor Office Park, Debtor.

### Bankruptcy No. 96–B–41249.

United States Bankruptcy Court, S.D. New York.

Oct. 7, 1996.

---

Bivona & Cohen, P.C. by Bruce Feldman, New York City, for The Dime Savings Bank of New York, FSB.

Peter Marc Stern, Brian Bromberg, New York City, for Debtor.

### MEMORANDUM DECISION

PRUDENCE BEATTY ABRAM, Bankruptcy Judge.

The debtor, Princeton Square Associates, LP (the "Debtor"), owns and operates an office building at 379 Princeton–Hightstown Road in East Windsor, New Jersey (the "Property"). The Debtor filed its Chapter 11 petition in this court on March 11, 1996.

The Property is encumbered by two mortgages held by The Dime Savings Bank of New York, FSB (the "Lender"). Within weeks of the Chapter 11 filing, the Lender made two motions. The first motion (Document No. 5) sought to transfer venue of this case to the District of New Jersey. The second motion (Document No. 7) (the "Lift Stay Motion") sought to prohibit the use of rents by the Debtor and to vacate the automatic stay to permit the continuation of the Lender's pre-petition foreclosure action.

This court held hearings on the Lift Stay Motion on April 18 and May 6, 1996. For the reasons it set forth in the record, the court orally denied both branches of the Lift Stay Motion. Unfortunately, due to the adversarial nature of the relationship between the Lender and the Debtor no order effecting the terms of the court's denial was properly presented to the court for signature until late August.[1] This memorandum deci-

---

1. The hearing on May 6 was devoted to reviewing the differences between the parties over the terms of an order embodying the court's ruling. Lender's counsel seems not to have appreciated that if no agreement on the form of an order was reached after the court conference that either party could settle an order embodying the court's ruling. During June, the Lender chose to submit additional briefing to the court without permission and submitted an order for signature that would *grant* the Lift Stay Motion notwithstanding that the court had plainly denied the Lift Stay Motion.

This court was finally required to have a telephonic conference with counsel for the Lender and the Debtor to review the proper procedures to follow to obtain a signed order, despite the fact that exactly the same advice had been conveyed to counsel by the court's law clerk on several occasions.

As this court pointed out to counsel, settling an order formalizing a court's ruling is not a barrier to taking an appeal from the ruling. Perhaps the trouble occurred because the order required more than boilerplate language. In particular, drafting an appropriate order required taking into account how the Property should actually be operated, a business, rather than legal, subject. It is unfortunate that much unproductive time has gone into what should have been an almost ministerial task.

While it is regrettable that it has taken several months to get the court's order reduced to writ-

sion is issued to set forth the reasons why this court has determined the Lift Stay Motion as it has and why it has selected to sign the Debtor's proposed order as better setting forth the court's ruling.

## RECAPITULATION OF FACTS

In or about December 1994, the Debtor entered into a restructuring agreement with the Lender. The then existing note and mortgage were modified and amended so as to provide for a Mortgage Note A in the original principal amount of $1,350,000 and a Mortgage Note B in the principal amount of $2,142,194.35. The terms of the restructuring agreement provide that, if Mortgage Note A is paid at maturity, December 1, 2000, then Mortgage Note B will be cancelled without further payment by the Debtor. In addition to the building and real property, the rents were assigned as collateral for the mortgages.

According to the Lift Stay Motion, the "as is" market value of the Property at March 29, 1994 was $1,400,000. Thus, even in the Lender's view, the Property is worth equal to or in excess of the amount due on Mortgage Note A.

It appears that the Debtor failed to make the mortgage payments due on and after October 1, 1995. The required monthly payments are in the approximate amount of $9,700, exclusive of real estate tax escrows.

The Lender commenced a foreclosure action in the Superior court of New Jersey, Chancery Division, Mercer County, Docket No. F–991–96, on or about February 13, 1996. On or about March 9, 1996, the Lender sought the appointment of a rent receiver in the foreclosure action. No rent receiver had been appointed before the Chapter 11 petition was filed.

## DISCUSSION

### A. Denial of the Vacation of the Automatic Stay

Upon request of a party in interest, Code § 362(d)(1) provides that the court shall lift the automatic stay for cause, including the lack of adequate protection of an interest in property of the party in interest. Under Code § 362(d)(2), the court is to lift the automatic stay with respect to a stay of an act against property if (A) the debtor does not have an equity in the property and (B) the property is not necessary for an effective reorganization. In 1994, a new subsection (d)(3) was added to Code § 362 which applies to a motion by a creditor whose claim is secured by real property in a single asset real estate case, a defined term.[2] Under (d)(3) the automatic stay is to be lifted after ninety days from the commencement of the case, if (a) the debtor has not filed a plan of reorganization that has a reasonable possibility of being confirmed within a reasonable time or (b) the debtor has not commenced monthly payment to the secured creditor. The Debtor in this case has commenced making monthly payments.

■ The Lender urges that the Debtor will be unable to propose a confirmable plan because the Debtor lacks equity in the Property since its present value is less than the sum of Mortgage Notes A and B. This argument is too simplistic and ignores the Debtor's right to pay off Mortgage Note A at maturity and thereby cause the cancellation of Mortgage Note B.

■ This court need not resolve all possible confirmation issues in connection with a lift stay motion. Since the Second Circuit issued its decision in 1994 in *In re Boston Post Road (Boston Post Road L.P. v. FDIC)*, 21 F.3d 477, *cert. denied*, —— U.S: ——, 115 S.Ct. 897, 130 L.Ed.2d 782 (1995), a debtor's ability to confirm a Chapter 11 plan in a single asset real estate case has been ham-

---

ing, no economic harm has occurred to the Lender from the delay since the Debtor has not used the rents for anything but what a receiver would have used them for.

2. The definition of single asset real estate case found in Code § 101(51B) provides that the term means real property constituting a single property or project on which no substantial business is being conducted by a debtor other than the business of operating the real property and having aggregate non-contingent, liquidated secured debts in an amount no more than $4,000,000.

pered in a case in which the secured creditor is undersecured. However in this case, the Lender will not have the leverage the usual undersecured mortgagee would have because the Debtor could propose a plan which provided for the reinstatement of Mortgage Notes A and B and for payment according to their original terms.

## B. *Denial of Request to Prohibit Use of Rents*

The second basis for the Lender's Lift Stay Motion is its belief that this court must deny the Debtor the use of the rents to maintain the Property. In *In re Jason Realty, L.P.*, 59 F.3d 423 (3d Cir.1995) (*"Jason"*), the Third Circuit [3] held that, when a mortgagor grants the mortgagee an assignment of rents and thereafter defaults, the mortgagor loses any rights to the rents. The Lender urges therefore that under no circumstances can the Debtor be permitted to "use" the

rents since the rents are solely the property of the Lender due to the Debtor's pre-petition mortgage payment default.

If the Debtor could not use the rents, then it would have no way to operate the Property. The practical reality is that the rents will be used to maintain the Property.[4] If this court were to lift the stay to allow the Lender to obtain appointment of a rent receiver, the rent receiver would use the rents to maintain the Property. For the reasons discussed *infra*, this court does not share the Lender's view that the Debtor cannot use the rents to maintain the Property.

 In this court's view, the proper determination of that portion of the Lift Stay Motion directed to a prohibition of the use of rents turns on the provisions of the Bankruptcy Code rather than an analysis of state law.[5] The real issue is not for *what* the rents will be used [6] but *who* will use them.

---

3. New Jersey, where the Property is located, is in the Third Circuit.

4. Unless a lender's mortgage is so small that it would rather keep a month or two's rents and walk away, a lender will be forced to allow the utilization of so much of the rents as are required for the upkeep of the mortgaged property in order to preserve the property pending sale.

5. In reaching the decision discussed below, this court has given careful consideration to the plain reading of the Bankruptcy Code. The Supreme Court has determined that interpretation of the Bankruptcy Code begins with the language of the statute itself. *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989); *Patterson v. Shumate*, 504 U.S. 753, 112 S.Ct. 2242, 119 L.Ed.2d 519 (1992); *Pennsylvania Department of Public Welfare v. Davenport*, 495 U.S. 552, 110 S.Ct. 2126, 109 L.Ed.2d 588 (1990). It has stated that courts must presume that the legislature says in a statute what it means and means in a statute what it says there. *Connecticut National Bank v. Germain*, 503 U.S. 249, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992). Courts properly assume, absent sufficient indication to the contrary, that Congress intends the words in its enactments to carry their ordinary, contemporary, common meaning. *Pioneer Investment Services Company v. Brunswick Associates Limited Partnership*, 507 U.S. 380, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993).
Where statutory language is plain and unambiguous, the court's sole function is to enforce it according to its terms. The plain meaning of a statute is conclusive, except where its literal application will produce a result demonstrably at odds with the intentions of its drafters. Courts

should also disfavor interpretations that render language superfluous. *United States v. Ron Pair Enterprises, supra; Connecticut National Bank v. Germain*, supra. Furthermore, when statutory language unambiguously expresses Congressional intent, reference to legislative history and to pre-Code practice is not necessary. *United States v. Ron Pair, supra; Patterson v. Shumate, supra; Dewsnup v. Timm*, 502 U.S. 410, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992). State law or prior practice will not impede the operation of the Code when the meaning of its text is clear. *Pennsylvania Department of Public Welfare v. Davenport, supra; BFP v. Resolution Trust Corporation*, 511 U.S. 531, 128 L.Ed.2d 556 (1994).

6. This court has made it clear that *what* the rents can be used for are the same things a receiver could use the rents for. In that regard this court believes that it is entirely faithful to the teaching of the United States Supreme Court in the seminal case of *Butner v. United States*, 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979). Although *Butner* involved a case under the former Bankruptcy Act, it was decided after the Bankruptcy Code went into effect. As a result, the Supreme Court discussed both the Code and Act and the decision is viewed as having continuing validity. *Butner* held that a determination of whether a trustee in bankruptcy or a mortgagee was entitled to the *surplus rents* was to be determined by reference to state law.

"Property interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bank-

The Bankruptcy Code resolves the *who* question in favor of the debtor in possession. Upon the filing of a Chapter 11 petition, the debtor becomes a debtor in possession. *See* Code § 1101(1). The debtor in possession has all of the rights and powers and is obligated to perform all of the functions and duties of a Chapter 11 trustee specified in Code § 1106.[7] *See* Code § 1107(a). In Chapter 11 any reference to "trustee" is deemed to refer to the debtor in possession when a trustee has not been appointed. *See* Code § 1107(a). Code § 1108 provides as follows:

> "Unless the court, on request of a party in interest and after notice and a hearing, orders otherwise, the trustee may operate the debtor's business."

The entire presumption underlying Chapter 11 is that the debtor in possession will continue to operate the debtor's business. The Lender would like to stand this presumption on its head by denying the Debtor in its capacity as debtor in possession the ability to operate its business by preventing the use of the rents without the necessity of proving that cause for the appointment of a trustee exists.[8] *See* Code § 1104(a).

Directly relevant to single-asset Chapter 11 real estate cases is Code § 543. *See* Code § 103 ("[C]hapters 1, 3 and 5 of this title apply in a case under * * * Chapter 11"). Code § 543(b) provides that a "custodian", a defined term which includes a receiver appointed in a foreclosure action,[9] shall promptly upon being notified of the petition filing turn over to the debtor any property held, as well as the rents of such property in the custodian's possession. *See generally, Matter of Kennise Diversified Corp.*, 34 B.R. 237 (Bankr.S.D.N.Y.1983). The court may excuse the turnover, only if, after notice and a hearing, the court determines that the interests of creditors would be better served by permitting the custodian to continue in control of the property.[10] *See* Code § 543(d).

Nothing in Code § 543 suggests that turnover depends on an analysis of state law to determine the effect of an assignment of rents. Thus, a debtor whose real property is in the hands of a receiver on the date the petition is filed, is entitled to an immediate turnover of the real property and the rents. *Compare In re Constable Plaza Associates, L.P.*, 125 B.R. 98, 103–04, 105 (Bankr. S.D.N.Y. 1991) (Court granted debtor's motion for turn-over of property under Code § 543(b)(1) because under either the debtor's or the secured creditor's approach, the rents would be applied towards the same purpose: the maintenance and expenses of operation of the debtor's office building.).

Yet if no receiver has been appointed at the time the petition is filed, following the Lender's argument, the debtor is impotent because, while in actual possession of the real property, it cannot use the rents

ruptcy proceeding. * * * [T]he federal bankruptcy court should take whatever steps are necessary to ensure that the mortgagee is afforded in federal bankruptcy court the same protection he would have under state law if no bankruptcy had ensued. * * * [A] bankruptcy judge familiar with local practice should be able to avoid this potential loss by sequestering rents or authorizing immediate state-law foreclosures. Even though a federal judge may temporarily delay entry of such an order, the loss of rents to the mortgagee normally should be no greater than if he had been proceeding in a state court. * * * The essential point is that in a properly administered scheme in which the basic federal rule is that state law governs, the primary reason why any holder of a mortgage may fail to collect rent immediately after default must stem from state law." 440 U.S. at 55–57, 99 S.Ct. at 918–19.

7. There are certain obvious and immaterial exceptions. The debtor in possession does not have the trustee's entitlement to compensation.

Nor is the debtor in possession expected to conduct an investigation of itself or file a report of such an investigation. *Compare* Code §§ 1107(a) and 1106(a).

8. Appointment of a Chapter 11 trustee in a single asset real estate case is not unknown. This court has appointed Chapter 11 trustees in several real estate cases that have successfully resulted in confirmed plans of reorganization. The most frequent circumstance warranting the appointment of a Chapter 11 trustee is a need for "new blood" to effectuate a sale of the property.

9. *See* Code § 101(11)(a) and (c).

10. Allegations were made by the Lender in papers filed in late June subsequent to the court's ruling that the Debtor has not been keeping the building up properly. These allegations have not been properly put before the court and therefore will not be considered at this time.

from it to maintain the property. Such a distinction is without any basis in logic or policy. Moreover it ignores the fact that the mortgagee is also a "custodian" and *required* to turnover the rents to the debtor for the purpose of managing the property.

The use of the rents by a debtor in possession to maintain the property to the same extent that a receiver of rents would use the rents does no economic harm to the lender.[11] And unlike the situation under state law in which the receiver may make no payments to the mortgage prior to the foreclosure sale, the Code contemplates that the debtor in possession will make periodic payments to the lender. *See* Code § 362(d)(3). Those payments result in the lender being better off than in a state court foreclosure action.

■ The protections the Bankruptcy Code provides to the secured creditor are many. Adequate protection is required for the "use" of the secured creditor's collateral. In the context of rents, this court concludes that no monetary protection is required to be provided by the debtor in possession to the secured creditor to the extent that the rents are applied for the maintenance of the property in the manner a receiver would apply the rents.[12] If monetary adequate protection were required, the secured creditor would get *more* in a bankruptcy case than in a state court foreclosure since in a state court foreclosure action the rents would be used up and no replacement "collateral" would ever be supplied.

■ Certainly adequate protection in a monetary form is required if the debtor in possession is permitted to use the rents for a purpose not deemed to be within the purview of the uses to which a receiver would put the rents. An example might be in the area of

capital improvements the debtor in possession thought appropriate but that the secured creditor did not believe would enhance the value of the property. Likewise, disagreements might arise over the cost of tenant improvements or extensive advertising campaigns.[13]

There can be no doubt that single asset real estate cases have been viewed with great negativity by lenders. This is actually surprising since the bankruptcy process can result in a much quicker resolution of the financial problems facing the parties than a state court foreclosure action. In the state of New York it is common for a state court foreclosure action to take a year and a half to two years or more from start to finish for a relatively uncomplicated case. In a bankruptcy case the debtor is likely to have from six to nine months to confirm a plan, failing which the court expects that the property will be gracefully surrendered to the lender.

In no way does the early use of the rents to maintain the property dictate the outcome of the case. It does not give the debtor the upper hand. Nor does it deprive the secured creditor of appropriate leverage. The secured creditor's mortgage still must be paid off, renegotiated, reinstated or otherwise successfully dealt with for the debtor to confirm a plan of reorganization.

■ The debtor in possession's desire to manage the property appropriately should equal or exceed that of the secured creditor. Both of their interests are served by a well-managed property. The debtor in possession may be able to regain the secured creditor's confidence by regularizing its management of the property and effectively communicating about management issues. Many times it appears that there has been a pre-petition break-down of communications between the

---

11. There may actually be more "surplus" rents when the debtor in possession manages the property because of the absence of receiver's commissions.

12. This means that the debtor in possession must hold the surplus, if any, for the secured creditor and may not treat it as its own property. *Compare In re Constable Plaza Associates, L.P., supra.*

13. While this is the first occasion this court has taken to write on the subject, this court has

handled all of its real estate Chapter 11 cases for several years guided by the principles set forth above for the use of the rents. With minimal need for court intervention, the debtors and the secured creditors have been able to agree on budgets and resolve "sticky" questions on a consensual basis. This has resulted in allowing these cases to progress promptly to the crucial question of whether the debtor will indeed be able to propose a confirmable plan of reorganization.

debtor and the secured creditor that has led to a distrust of the debtor. Sometimes that distrust is warranted. Many times it is not. Chapter 11 can provide a breathing spell for both parties to attempt to work out their differences with each other. The debtor may well have made a substantial investment in the property and be confronted with a profound sense of impending financial loss.[14] While that loss may be legally subordinate to the lien of the mortgage, it is no less important to the debtor and its owners.

Should the Debtor fail to properly manage the property and that is satisfactorily proven, this court might be constrained to lift the automatic stay to permit the Lender to have a receiver appointed to take charge of the property. Should the Debtor be unable to propose a plan which provides for the payoff of the first mortgage in full, the Debtor will likely fail to confirm a plan due to the outstanding second mortgage, which would be eliminated only by the payment in full of the first mortgage.

*Reasons for Signing Debtor's Order*

After a number of false starts, the Lender settled an order with respect to the court's rulings on its motions. The Debtor settled a counter-order. It is unfortunate that the parties were not able to submit an order embodying the court's ruling and containing appropriately specific provisions for the management of the property. Perhaps the Lender was concerned that if it undertook to negotiate reasonable management terms that it would appear to have modified its hard-line position.

■ The Lender's order contains a number of specific provisions that are either not reasonable, appropriate or necessary. For example, the Lender's proposed order would have the Debtor hire a new managing agent and required that entity to be "disinterested" within the meaning of Code § 327. There is no requirement that a managing agent for real property meet the "disinterested" standard. Nor were there any allegations in the Lender's moving papers that would warrant this court to direct that the Debtor select a

new managing agent. The problems with the named landlord under certain pre-petition leases for the Property brought up by the Lender were resolved on the record by the concession by Debtor's counsel that all such leases were the Debtor's property.

■ The Lender's order also calls for copying of bills and invoices and other recordkeeping provisions that are unnecessarily cumbersome. However, the Lender is entitled to receive appropriately detailed monthly operating reports and to review back-up information, if necessary, on an appropriate request.

Despite the extensive discussions had on the record on the form of the order, the Lender never made any meaningful modifications from the order it had proposed prior to the discussions. The Lender's unreasonable demands appear to have precluded any ability to reach a consensual order.

■ The counter-order provides that the Debtor may use rents to the extent that a receiver could. While this court would have preferred an order which outlined the normal expenses of operation and detailed a mechanism for obtaining approval of extraordinary expenses, the counter-order is sufficiently precise as to guide the debtor in possession's operations.

For the reasons stated above, this court has concluded that the counter-order settled by the Debtor is the order which more correctly reflects this court's ruling and that is the order which has been signed.

---

**14.** The amount of a debtor's financial investment in a property is a factor a court should consider in the handling of a case. In this case, there are in excess of thirty limited partner investors.