**In re Ronald TAIBBI, d/b/a Satin & Lace Photography Studios, a/k/a Ronald M. Taibbi, a/k/a Ronnie Taibbi, a/k/a Ron Taibbi, a/k/a Ronald Tiabbi, a/k/a Ron Tiabbi and Patricia Taibbi, d/b/a Satin & Lace Photography Studios, a/k/a Patricia A. Taibbi, a/k/a Patricia Taivvi, a/k/a Patricia Tiabbi, a/k/a Pat Tiabbi, Debtors.**

**Bankruptcy No. 095–71313–511.**

United States Bankruptcy Court, E.D. New York.

Sept. 25, 1997.

Stanley Somer & Associates by Jeffrey T. Heller, Commack, NY, for Debtors.

Robert J. Cimino, Suffolk County Attorney by Janice A. Whelan, Assistant County Attorney, Hauppauge, NY, for Suffolk County Executive Office of Citizens Affairs.

1. OCA is an administrative agency created by the Suffolk County Legislature in Local Law 17–1992. The OCA is empowered to receive and investigate complaints of unfair or deceptive trade practices against consumers. In performing its functions, OCA administers the provisions of the Suffolk County Consumer Protection Law (Section 249 of the Suffolk County Code).

2. The vast majority of the claims range in amount between $1,000 and $2,500.

**OPINION and ORDER**

MELANIE L. CYGANOWSKI, Bankruptcy Judge.

The Suffolk County Executive's Office of Citizen Affairs ("OCA")[1] is the agency chosen by Suffolk County to investigate instances of fraud allegedly practiced upon the consumers within its borders. In April of 1995, OCA issued 21 notices of violation of the Suffolk County Consumer Protection Law to Ronald and Patricia Taibbi, d/b/a Satin and Lace Photography Studios (the "Debtors"), alleging deceptive trade practices in that the Debtors failed to deliver wedding photographs and/or issue refunds as promised in contracts executed with prospective brides and grooms. Rather than defend that proceeding, the Debtors filed—45 minutes prior to the hearing scheduled by an OCA hearing officer—a voluntary petition seeking relief under chapter 7, listing on their schedules 289 individual creditors holding claims arising from such contracts which aggregate slightly more than $637,000.[2]

The Taibbis' counsel appeared at the OCA hearing and demanded that the proceeding be halted, failing which all participants would risk an order of contempt, as he contended the proceeding was stayed by 11 U.S.C. § 362. *See* Exh. E (Determination and Decision of Hearing Officer Drew, dated May 25, 1995, hereafter referred to as the "Decision") to Declaration of Janice A. Whelan, Esq., dated Oct. 6,1995 ("Whelan Decl.").

The hearing officer, after consultation with the county attorney, concluded that the proceeding was "a duly called regulatory proceeding of a governmental unit designed to enforce the Suffolk County Consumer Protection Code" and as such was excepted from the stay pursuant to 11 U.S.C. § 362(b)(4). *See* Exh. E to Whelan Decl. Accordingly, the hearing officer advised Debtors' counsel that the hearing would proceed *in absentia*, if necessary.[3] Debtors' counsel left, and the

3. The letter sent to the Debtors by the Director of the Enforcement and Finance Division of OCA, dated April 25, 1995, to advise them of the hearing stated that "failure to appear as scheduled may occasion the Hearing to be held 'in absentia' or a default decision rendered if you fail to appear, with the assessment of such penalties as may therein be determined." *See* Whelan Decl., Exh. D.

hearing officer thereafter took sworn testimony from witnesses. Ten days later, the hearing officer issued her Decision, which concluded as follows:

"Based upon a comprehensive study and review of the information and documentatiuon [sic] contained in the record, along with the sworn testimony of the parties, it is determined that there is substantial evidence that Respondents did in fact, knowingly and deliberately mislead consumers in each instance, by engaging in deceptive and unconscionable trade practices which are prohibited by Suffolk County's Consumer Protection Law, without any mitigating factors to his behaviour. The violations are deemed founded and the maximum penalty is assessed. The maximum penalty for each violation count is $500.00. 21 COUNTS = $10,500.00 due and payable to the Suffolk County Office of Citizen Affairs by June 30, 1995. In addition, it is recommended that the Director of the Bureau of Enforcement and Finance of the Suffolk County Office of Citizen Affairs, review the circumstances of the subject cases with the District Attorney's office for possible criminal sanctions, and with both the County Attorney and the State Attorney General for possible action vis a vis the Bankruptcy Court." [4]

### The Present Controversy

Upon the Debtors' bankruptcy filing, the time within which creditors could object to the Debtors' discharge or seek to except certain debts from discharge was fixed at August 28, 1995. All creditors were sent notice of the deadline on June 5, 1995. On August 24, 1995, OCA moved for an order granting it an extension of time to file a complaint objecting to the discharge of the Debtors or to determine the dischargeability of certain debts. That motion is the subject of the present controversy.

OCA intends to commence an adversary proceeding to except the $10,500 from discharge, and requests an extension of time to file its complaint, because it alleges that it has sixty consumer complaints against the Debtors to investigate, which will require it to interview the complainants and other witnesses. OCA wants to finish its investigation in order to determine whether it would also object to the discharge of the Debtors pursuant to 11 U.S.C. § 727 and/or object "to the discharge of the debts owed to the individual consumers pursuant to s. 523." [5] See Application for an Order to Extend the Time to File a Complaint, ¶ 13.

The Debtors oppose the motion. The Court requested briefing of the issues and, following further oral argument, reserved decision. [6] This decision constitutes the Court's findings of fact and conclusions of law to the extent they are required.

### DISCUSSION

### I. OCA's Standing to File a Complaint

The Debtors argue that OCA is acting beyond the scope of its authority in representing consumers individually and that its continuing efforts to seek restitution for the individuals' benefit "is outrageous conduct and should not be condoned by this Court." Affirmation of Jeffrey Heller, Esq. dated Sept. 14, 1995 ("Heller Aff."), ¶ 3. The Debtors also contend that OCA lacks standing to

---

4. The Debtors filed a motion on June 25, 1995, seeking to permanently enjoin the County, OCA, and the hearing officer from continuing with their investigations, hearings and other actions on the basis that the such activity was in violation of the automatic stay. The Debtors further sought an order declaring that the hearing officer's determination to be void because it was allegedly entered in violation of the stay. That motion was denied by Order of this Court, dated August 24, 1995. The Debtors did not appeal. In addition, OCA has filed a proof of claim asserting an unsecured, priority claim in the amount of $10,500, as a penalty owed to a governmental unit.

5. None of the creditors whose complaints were the subject of the Decision filed a timely dischargeability complaint or motion to extend time; neither did any of the other individuals listed on Schedule F.

6. On October 3, 1995, the Court entered an Order extending OCA's time to commence an action on behalf of itself and the individual consumers pending the submission of the additional briefs, and declaring that the individual consumers' time to commence an action under §§ 727 or 523 "has expired."

bring a dischargeability action on behalf of the consumers.

OCA's contentions are two-fold. First, it argues that the Suffolk County Consumer Protection Law ("CPL") and Resolution 768–1992 of the Suffolk County Legislature (by which the Legislature adopted Local Law 17–1992) provide it with statutory authority to maintain an action on behalf of the consumer creditors. Secondly, it argues that it has standing to commence an adversary proceeding under the doctrine of *parens patriae.*

### A. Statutory Standing

Section 523(c)(1) of the Bankruptcy Code provides, in pertinent part, that

> [T]he debtor shall be discharged from a debt of a kind specified in paragraph (2), (4), (6), or (15) of subsection (a) of this section, unless, *on request of the creditor to whom such debt is owed,* and after notice and a hearing, the court determines such debt to be excepted from discharge ...

(emphasis added). The term "creditor" means "an entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor." 11 U.S.C. § 101(10). The term "debt" is defined as "liability on a claim." 11 U.S.C. § 101(12). With respect to its desire to file a dischargeability proceeding on behalf of individual consumers, the central question is therefore whether OCA holds a "claim" sufficient to confer upon it standing to sue.

 The term "claim" means "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated,

fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 11 U.S.C. § 101(5). At this point in the development of bankruptcy jurisprudence, it is settled that when enacting these statutory provisions, Congress intended to "adopt the broadest possible definition of 'claim,'" and the meanings of the terms "debt" and "claim" are coextensive. *Pennsylvania Dept. of Public Welfare v. Davenport,* 495 U.S. 552, 558, 110 S.Ct. 2126, 2130–31, 109 L.Ed.2d 588 (1990) (holding that restitution obligations are claims dischargeable in chapter 13).[7] The phrase "right to payment" means "nothing more nor less than an enforceable obligation...." *Davenport, supra,* 495 U.S. at 559, 110 S.Ct. at 2131.

OCA contends that non-bankruptcy law, *i.e.,* the CPL, gives it a right to seek payment on behalf of the individual consumers. The CPL provides as follows:

> § 249–1. Unfair trade practices prohibited.
>
> No person shall engage in any deceptive or unconscionable trade practices in the sale, lease, rental or loan, or in the offering for sale, lease, rental or loan, of any consumer goods or services or in the collection of debts.

> § 249–2. Definitions.
>
> As used in this chapter, the following terms shall have the meanings indicated:

> * * *

> COMMISSIONER—The Commissioner of Consumer Affairs.[8]

**7.** Although the result in *Davenport* has been overruled by the 1990 amendments to chapter 13 of the Bankruptcy Code, Congress left undisturbed the Supreme Court's expansive definition of "claim." *Johnson v. Home State Bank,* 501 U.S. 78, 84 n. 4, 111 S.Ct. 2150, 2154 n. 4, 115 L.Ed.2d 66 (1991).

**8.** In 1992, the Suffolk County Department of Consumer Affairs, headed by the Commissioner, was abolished. Its "functions, duties and responsibilities" were transferred to OCA by Section 1 of Local Law No. 17–1992. OCA was thereby established, to be headed by a Director. Accordingly, the Court interprets all references in the CPL to the Commissioner or the Department of Consumer Affairs as referring to the Director or OCA Local Law 17–1992 also sets

forth a laundry list of OCA's powers and duties, including the following:

> A.) To receive and investigate complaints and initiate investigations of unfair or deceptive practices against consumers.
> B.) To hold hearings, subpoena witnesses, administer oaths, take the testimony of any person under oath and in connection therewith compel the production of any evidence relating to any matter under investigation by the Office of Citizen Affairs, provided that the Director shall obtain the written consent of the County Executive or the County Attorney before issuing a subpoena or subpoena duces tecum....
> D.) To represent the interests of consumers before federal, state and local administrative and regulatory agencies and legislative bodies....

\* \* \*

§ 249-3. Promulgation of rules and regulations.

The Commissioner may, after a public hearing, adopt such rules and regulations as may be necessary to effectuate the purposes of this chapter, including regulations defining specific deceptive or unconscionable trade practices. . . .

§ 249-A. Penalty for offenses; injunctive relief.

A. A violation of any provision of this chapter or of any rule or regulation promulgated hereunder shall be punishable, upon proof thereof, by the payment of a civil penalty in the sum of not more than five hundred dollars ($500.) for each such violation, to be recovered in a civil action.

B. Whenever any person has engaged in any acts or practices which constitute repeated or persistent violations of any provision of this chapter or any rule or regulation promulgated hereunder, the County Attorney, upon the request of the Commissioner, may commence an action *in the name of the county* for a restraining order, temporary or permanent injunction *or other equitable relief.*[9]

§ 249-5. Settlements.

A. In lieu of instituting or continuing action pursuant to this chapter, the Commissioner may accept written assurance of discontinuance of any act or practice in violation of this chapter. Such assurance may include a stipulation for the voluntary payment by the alleged violator of the costs of investigation for [sic] the *restitu-*

*tion by the alleged violator to consumers of money, property or other things received from such consumers in connection with a violation of this chapter.*

B. An assurance entered into pursuant to this section shall not be deemed to admit the violation unless it does so by its terms.

C. A violation of an assurance entered into pursuant to this section shall be treated as a violation of this chapter and shall be subject to all the penalties provided thereof.

(emphasis added).

■ The CPL, together with Local Law 17–1992, therefore authorize OCA to do several things: to promulgate rules and regulations to effectuate its purposes, to hold administrative hearings, to issue subpoenas, and to take testimony under oath. Upon finding a violation, OCA is specifically empowered to seek several cumulative remedies: it may assess civil penalties for each violation *and* request the county attorney (upon a finding of repeated or persistent violations) to commence an action *in the name of the county*, seeking a restraining order, injunction or *other equitable relief.* In addition, in lieu of commencing or continuing such an action, OCA is specifically authorized to accept a stipulation which provides for *restitution.* If the stipulation is violated, OCA is authorized to treat the violation as itself a violation of the CPL. The statute does not expressly create a private right of action; all of these powers and functions are vested solely in OCA.[10] *See In re Austin,* 138 B.R.

---

\* \* \*

I.) To report to the appropriate law enforcement agency information with respect to the violation of any federal, state, or local consumer protection law. . . .

K) To assist, advise, and cooperate with local, state and federal agencies to protect and promote the interests of the consumers of Suffolk County.

9. OCA contends, and the Debtors do not dispute, that the Director of OCA has "directed the Suffolk County Attorney's Office to institute a non-dischargeability proceeding on behalf of the individual consumers in this matter." *See* Mem. of Law on Behalf of Suffolk County Executive's Office of Citizen Affairs, at 6 n. 2.

10. To determine whether a private right of action exists where none is expressed in the statute, the courts apply a three-part test: (1) whether the plaintiff is one of the class for whose particular benefit the statute was enacted, (2) whether recognition of a private right of action would promote the legislative purpose, and (3) whether creation of such a right would be consistent with the legislative scheme. *Americana Petroleum Corp. v. Northville Indus. Corp.*, 200 A.D.2d 646, 648, 606 N.Y.S.2d 906, 908 (2d Dep't 1994). The Court assumes, without deciding, that creation of a private right of action under the CPL would not, for the reasons stated herein, be consistent with the statutory scheme. However, several bankruptcy courts have allowed standing to various public agencies despite the fact that the statute at issue authorizes a private right of action to implement its enforcement. *In re Maio,*

898, 904 (Bankr.N.D.Ill.1992) (stating that "the FTC is the *only* party that can be considered a creditor on a claim arising from a violation of § 5(a) of the Federal Trade Commission Act. The FTC has exclusive authority to bring suit to redress violations.... There is no private right of action under the Act. Thus, the only way in which the ... Act can be enforced is for the FTC to bring actions against violators in its own name").

■ The Court believes that the CPL provisions, together with Local Law 17–1991, grant OCA the right to seek payment on behalf of injured consumers. First, the specific authorization to commence an action seeking "equitable relief" is broad enough to encompass an action for restitution, an equitable remedy. *Mertens v. Hewitt Assoc.,* 508 U.S. 248, 255, 113 S.Ct. 2063, 2068, 124 L.Ed.2d 161 (1993) (interpreting phrase "other appropriate equitable relief" as allowing only actions for relief typically available in equity, such as injunction, mandamus and restitution). Secondly, the statutory scheme as a whole implicitly recognizes OCA's ability to seek restitution, as it authorizes OCA to accept restitution as a substitute for legal action. Any other reading would render the statute unintelligible: it would mean that OCA would be permitted to discontinue an action based upon a promise of a remedy it had no right to seek in the first place. While the Court concedes that the legislature's intentions could be more clearly expressed, it is unwilling to transform inartful language into utter nonsense.

176 B.R. 170 (Bankr.S.D.Ind.1994) (finding that the SEC had standing to maintain a dischargeability action notwithstanding the existence of a private right of action under securities law); *In re Taite,* 76 B.R. 764 (Bankr.C.D.Cal.1987) (State of California had standing to maintain dischargeability complaint for restitution under state law); *In re Smith,* 39 B.R. 690 (Bankr.N.D.Ill.1984) (attorney general had standing despite the fact that Illinois Consumer Fraud Act granted private right of action to consumers).

**11.** As OCA has yet to file a complaint, the Court is unable to predict with certainty OCA's theory of recovery. The Court notes that the requirement that the complaint be filed by the creditor to whom the debt is owed, as set forth in § 523(c)(1), is limited to complaints filed under §§ 523(a)(2), (4), (6) or (15). Many of the cases

In short, OCA is authorized to enforce the CPL by assessing civil penalties and commencing an action for equitable relief and by accepting restitution. It may then sue to enforce the restitution stipulation. The Court believes that this scheme is sufficient to give OCA a right to payment—an "enforceable obligation"—on behalf of injured consumers.[11] *See In re Tapper,* 123 B.R. 594 (Bankr.N.D.Ill.1991) (explicit statement in Illinois consumer protection statute which allowed attorney general to "bring an action in the name of The People" and to seek restitution was sufficient to confer standing to determine dischargeability). OCA's ability to enforce such claims on behalf of defrauded consumers in the state court leads this Court to conclude that it is the "creditor to whom the debt is owed" within the meaning of section 523(c)(1). *In re Volpert,* 175 B.R. 247 (Bankr.N.D.Ill.1994).

While the Court need not rely on public policy arguments to support its conclusions, strong public policy also clearly favors the instant result. The CPL codifies Suffolk County's desire to protect vulnerable consumers against unconscionable or deceptive business practices. *See In re DeFelice,* 77 B.R. 376 (Bankr.D.Conn.1987). *DeFelice* held that New York's Attorney General had standing to challenge the dischargeability of debts owed to victims of consumer fraud, notwithstanding the fact that none of the individuals had themselves filed a dischargeability complaint. The Attorney General was acting pursuant to New York Executive Law Section 63(12) (McKinney 1993),[12] which, he

dealing with restitution orders assert nondischargeability under § 523(a)(7). The fact that any restitution awarded may ultimately end up in consumers' hands would be immaterial under § 523(a)(7). *Cisneros v. Cost Control Marketing & Sales Mgt. of Virginia, Inc.,* 862 F.Supp. 1531 (W.D.Va.1994), *aff'd,* 64 F.3d 920 (4th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 1673, 134 L.Ed.2d 777 (1996).

**12.** Executive Law Section 63(12) provides:

Whenever any person shall engage in repeated fraudulent or illegal acts or otherwise demonstrate persistent fraud or illegality in the carrying on, conducting or transaction of business, the attorney general may apply, in the name of the people of the state of New York, to the supreme court of the state of New York, on

argued, empowered him to act on behalf of victims of consumer fraud and that public policy supported a grant of standing. The *DeFelice* Court agreed. First, the Court recited the fundamental tenet that the bankruptcy court is not to be used as a "haven for wrongdoers." Secondly, the Court distinguished *In re Cannon,* 31 B.R. 823 (Bankr. E.D.Mo.), *aff'd,* 36 B.R. 450 (E.D.Mo.1983), *aff'd,* 741 F.2d 1139 (8th Cir.1984), on the ground that the Missouri statute at issue there, unlike Section 63, did not authorize the Attorney General to recover restitution on behalf of individual consumers. As noted above, this Court has found that OCA *is* authorized to seek restitution on behalf of consumers, and thus *Cannon* is distinguishable here, as well.

The *DeFelice* Court further relied upon the statutory scheme and legislative history of the Bankruptcy Code itself (specifically, 11 U.S.C. §§ 362(b)(4) and (5)), which reveals a congressional intent to protect the economic welfare of consumers. "Where a governmental unit is suing a debtor to prevent or stop violation of fraud, environmental protection, consumer protection, safety, or similar police or regulatory laws, or attempting to fix damages for violation of such a law, the action or proceeding is not stayed under the automatic stay...." H.R.Rep. No. 595, 95th Cong., 1st Sess. 343, *reprinted in* 1978 U.S.Code Cong. & Admin. News, 5787, 5838. The *DeFelice*

Court thus held that "it would be anomalous for a state to be permitted to institute or continue such an action but lack standing to challenge the dischargeability of the underlying debt necessary to make that action meaningful." 77 B.R. at 379. While this Court may not completely espouse the reasoning of *DeFelice,* which did not fully address § 523(c)(1), it finds on the facts of this case that OCA has standing.

The Debtors contend that Local Law 17–1992 and Executive Law 63 are substantially different, since section 63 explicitly authorizes the attorney general to prosecute actions in which the state is interested and allows him to ask the state court for an order enjoining the continuance of "fraudulent or illegal acts", directing restitution, and damages. The Court does not, however, find the statutes to be so substantially dissimilar as to warrant opposite results. Both statutes authorize an action in the name of the governmental entity where there are repeated consumer fraud violations. Both authorize the government to take proof and issue subpoenas, and both authorize the settlement of an action by acceptance of restitution—in fact, the CPL is more explicit in this regard.

The Debtors focus on the laundry list of OCA's powers and duties set forth in Local Law 17–1992,[13] and point out that critically

---

notice of five days, for an order enjoining the continuance of such business activity or of any fraudulent or illegal acts, directing restitution and damages and, in an appropriate case, canceling any certificate filed under and by virtue of the provisions of section four hundred forty of the former penal law or section one hundred thirty of the general business law, and the court may award the relief applied for or so much thereof as it may deem proper.... In connection with any such application, the attorney general is authorized to take proof and make a determination of the relevant facts and to issue subpoenas in accordance with the civil practice law and rules. Such authorization shall not abate or terminate by reason of any action or proceeding brought by the attorney general under this section.

\*\*\*

In any case where the attorney general has authority to institute a civil action or proceeding in connection with the enforcement of a law of this state, in lieu thereof he may accept an assurance of discontinuance of any act or practice in violation of such law from any

person engaged or who has engaged in such act or practice. Such assurance may include a stipulation for the voluntary payment by the alleged violator of the reasonable costs and disbursements incurred by the attorney general during the course of his investigation. Evidence of a violation of such assurance shall constitute prima facie proof of violation of the applicable law in any civil action or proceeding thereafter commenced by the attorney general.

13. The Debtors also assert that pursuant to Local Law 17–1992, OCA is organized into four divisions, none of which is a legal division. That is, Local Law 17–1992 refers to the Bureaus of Administration, Consumer Complaints, Licensing and Weights & Measures. However, the Notice of Violation sent to the Debtors was signed by the "Director, Enforcement and Finance Division." Similarly, the Decision refers to both the Enforcement and Finance Division and an "Adjudication Division." The record is devoid of any explanation, but the Court suspects that the Debtors' assertions about the organizational structure of OCA may not be quite correct.

absent is authority for OCA to represent individual consumers before the judiciary. But the Debtors' myopic vision focuses too narrowly on Local Law 17–1992 for, as the Court has found above, OCA's authority to sue on behalf of consumers springs not from the statute which merely transfers functions from the Department of Consumer Affairs to OCA, but from the CPL itself.

In addition, the Debtors complain that OCA's current argument is inconsistent with the position it advocated at the hearing on the Debtors' motion to consider whether OCA's activities violated the automatic stay, and that OCA should not be permitted to change course midstream. At the prior hearing, OCA stated on the record that it was not seeking restitution on behalf of individuals, but was "performing its regulatory function, and seeking to obtain penalties per the Suffolk County Code to be paid into its general coffer." *Id.* at ¶ 16. While the Court acknowledges that OCA's positions may have changed since that hearing, the Court finds nothing in the CPL which makes the remedies that OCA may seek mutually exclusive.[14] Rather, the CPL authorizes OCA to assess penalties (in its regulatory capacity) *and*, upon repeated violations, to commence an action seeking restitution. That OCA had not elected to commence an action seeking restitution prior to the filing with respect to the 21 affected consumers does not extinguish its ability to commence such an action now.

The Debtors argue that OCA's enforcement of the CPL will not be hindered by denying it the ability to seek restitution on behalf of consumers, because OCA may still impose civil penalties. This argument ignores, however, the fact that the CPL authorizes OCA to undertake both pursuits, and it may well be that OCA's power to seek restitution is a more coercive, and therefore more effective, deterrent to fraudulent business practices than a $500 penalty.

Many of the cases which allow standing to public agencies have their genesis in the 1952

decision of the United States Supreme Court in *Nathanson v. National Labor Relations Board*, 344 U.S. 25, 73 S.Ct. 80, 97 L.Ed. 23 (1952), decided under the Bankruptcy Act. In *Nathanson*, the National Labor Relations Board (NLRB) obtained a pre-petition order directing the debtor to pay certain employees back pay which they had lost on account of its unfair labor practices. Thereafter, the NLRB filed a claim in the bankruptcy case, and its standing to do so became at issue. The Supreme Court held:

> We think the Board is a creditor as respects the back pay awards, within the meaning of the Bankruptcy Act. The Board is the public agent chosen by Congress to enforce the National Labor Relations Act. A back pay order is a reparation order designed to vindicate the public policy of the statute by making the employees whole for losses suffered on account of an unfair labor practice. Congress has made the Board the only party entitled to enforce the Act. A back pay order is a command to pay an amount owed the Board as agent for the injured employees. The Board is therefore a claimant in the amount of the back pay.

344 U.S. at 27, 73 S.Ct. at 82 (internal citations omitted). The rationale of *Nathanson* is equally applicable here.

Lastly, many of the cases which have denied standing to public agencies are distinguishable. In *In re Lacy*, 74 B.R. 23 (Bankr. D.Or.1987), two statutes were at issue. The first, the Oregon Racketeering Influenced and Corrupt Organizations Act, did not contain a provision authorizing the state to seek restitution. The second, the Oregon Securities Law, contained a restitution provision, but specifically granted the victims—and not the state—the right to be awarded a judgment and the right to enforce the restitution order. The case of *In re Hanson*, 104 B.R. 261 (Bankr.N.D.Cal.1989), concerned the certification of a class action by defrauded investors on "behalf of themselves and all others similarly situated", and not an action by a

---

**14.** Nor does the fact that OCA may have changed its position to seek additional relief necessarily imply that the Court erred in its determination that the automatic stay was not violated by the continuance of the enforcement proceedings. As noted above, the CPL does not prevent the OCA from pursuing alternative or parallel courses of conduct.

governmental body pursuant to statute. In *In re Cross,* 203 B.R. 456 (Bankr.C.D.Cal. 1996), the Securities and Exchange Commission had commenced an action for violations of the Securities Act and, prior to the filing, had obtained a permanent receiver for the corporate assets. The SEC also obtained a restitution order which directed the debtor to pay restitution to the receiver for distribution to defrauded investors. Upon the debtor's bankruptcy filing, both the SEC and the receiver filed dischargeability complaints. The *Cross* court held that it was the receiver, and not the SEC, which had a right to payment, and therefore held that the SEC was not the "creditor to whom the debt is owed" under section 523(c)(1).

## B. Standing under the Doctrine of Parens Patriae

■ The phrase "parens patriae," which literally means "parent of the country," refers traditionally to the role of a state as sovereign and guardian of persons under legal disability, and embodies the principle that the state must care for those who cannot take care of themselves. *See* Black's Law Dictionary, at 1114 (6th ed.1990). It is a doctrine of standing used to protect a government's quasi-sovereign interests such as the "health and well-being—both physical and economic—of its residents in general." [15] *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez,* 458 U.S. 592, 607, 102 S.Ct. 3260, 3269, 73 L.Ed.2d 995 (1982).

■ To have standing under the doctrine of *parens patriae,* the governmental entity must establish the following elements:

(1) the state must have a quasi-sovereign interest, apart from the interests of particular private parties;

(2) there must be an injury to a substantial segment of its population; and

(3) the individuals could not obtain complete relief through a private suit.

*Alfred L. Snapp, supra,* at 600, 608, 102 S.Ct. at 3265, 3269; *People by Abrams v. 11 Cornwell Co.,* 695 F.2d 34 (2d Cir.1982), *modified on other grounds,* 718 F.2d 22 (2d Cir.1983) (en banc).

■ To meet the first prong of the test, OCA contends that the county has a quasi-sovereign interest in enforcing the CPL in the courts in order to protect county residents from consumer fraud. It further contends that its interest is directly linked to its attempt to block the discharge of listed debts so that a discharge does not preclude restitution to the individual consumer-creditors, and "the fact that the individual consumer-creditors would also benefit from Citizens Affairs actions does not diminish that interest." Mem. on Behalf of Suffolk County Executive's Office of Citizen Affairs, at 11. The Debtor counters that OCA is not the entity empowered or authorized to vindicate the consumer protection law in the courts. But, as set forth above, the Court disagrees and finds that OCA *is* charged with the enforcement of the CPL, and that it may seek such enforcement in the courts. As stated by the Supreme Court in *Alfred L. Snapp:*

> One helpful indicia [sic] in determining whether an alleged injury to the health and welfare of its citizens suffices to give the state standing to sue as *parens patriae* is whether the injury is one that the state, if it could, would likely attempt to address through its sovereign law-making powers.

*Alfred L. Snapp, supra,* at 607–608, 102 S.Ct. at 3269.

Here, Suffolk County *has* attempted to address injuries resulting from consumer fraud, by enacting the CPL and creating OCA. Accordingly, the Court finds that the County has a quasi-sovereign interest, apart from that of its residents, in ensuring the

---

**15.** At least one court has held that the doctrine is available only in a common law action, and should not be used to avoid the explicit standing requirements of a statute. *In re Lacy, supra,* 74 B.R. 23. However, the leading case decided by the U.S. Supreme Court, *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez,* 458 U.S. 592, 607, 102 S.Ct. 3260, 3268–3269, 73 L.Ed.2d 995 (1982), applied the doctrine and granted stand- ing to the Commonwealth of Puerto Rico under federal statutes which allowed certain labor determinations to be made "upon petition of the importing employer". The Court also stated that the common-law approach has "relatively little to do with the concept of *parens patriae* standing that has developed in American law." *Id.* at 600, 102 S.Ct. at 3265.

consumers within its borders are protected from unfair or deceptive business practices. *See In re Edmond,* 934 F.2d 1304 (4th Cir. 1991); *In re Tapper,* 123 B.R. 594 (Bankr. N.D.Ill.1991); *In re Sclater,* 40 B.R. 594 (Bankr.E.D.Mich.1984) (Stan Bernstein, J.) (finding that attorney general had *parens patriae* standing to prosecute dischargeability complaint based upon fraud under Michigan's Consumer Protection Act); *In re Hemingway,* 39 B.R. 619, 622 (N.D.N.Y.1983) ("[O]ne would be hard-pressed to argue that protection against consumer fraud is *not* a subject of vital importance to the economic well-being of the citizens of New York State").

To meet the second prong, OCA points to *In re DeFelice* in which the court determined that the "numerosity" element is satisfied where the state is seeking to protect the interest of 51 consumers. As OCA has received 64 complaints, it contends that it has satisfied the requirement that a substantial segment of its citizens are involved. The Court agrees. *See also In re Hemingway,* 39 B.R. 619 (N.D.N.Y.1983) (holding that state had *parens patriae* standing to prosecute dischargeability complaint on behalf of six consumers who were beneficiaries of a restitution order, and stating that "it must not be overlooked that such representation is part of a much broader scheme of consumer protection"); *In re Volpert, supra,* 175 B.R. at 257 ("courts must consider both the 'direct' and 'indirect' effects of an alleged injury when making this determination"; injury to 55 investors could constitute injury to "sufficiently substantial" segment of the population).

To meet the third prong, OCA points out that section 249 was enacted in recognition of the fact that victims of consumer fraud need the county's assistance to maximize their chances of recovery, and points out that a dischargeability complaint is only the first step needed to afford relief in the form of payment of their claims. It argues that it has satisfied the burden of proving that complete relief is unavailable to the individuals without the assistance of the county.

The Debtors respond that the doctrine of *parens patriae* does not save OCA, because

individuals could have obtained relief, but chose not to do so by letting the deadline for filing complaints lapse. While this argument has certain superficial appeal, the Court believes that it is ultimately not persuasive.

First, it is not at all clear that the consumers could have brought an action under the CPL, which does not appear to create a private right of action. *See In re DeFelice, supra,* 77 B.R. 376 (holding that state satisfied burden of showing that individuals could not obtain relief where statute contained no private right of action); *In re Hemingway, supra,* 39 B.R. 619 (same). Even if the consumers could have filed their own discharge or dischargeability complaints alleging claims under the consumer protection law, courts have granted standing to public agencies notwithstanding consumers' ability to commence their own actions. *In re Edmond, supra,* 934 F.2d at 1312 ("the Act's inclusion of a possible private right of action does not affect the state's ability to achieve standing under the *parens patriae* doctrine"); *In re DeFelice, supra; In re Maio, supra,* 176 B.R. 170; *In re Volpert, supra,* 175 B.R. 247. The reasoning supporting those decisions is even more compelling here, where the amounts awarded in any restitution order may well be too small to warrant the engagement of counsel to file an adversary proceeding. *In re Volpert, supra.* Lastly, it may be that some of the sixty affected consumers may have relied upon OCA to prosecute their claims by filing complaints with OCA after the bankruptcy filing instead of with the bankruptcy court. *Id.* (stating that injured investors had relied upon state action).

## II. *"Cause" for an Extension of Time*

■ The Debtors assert that after this Court ruled that OCA's continuation of the hearing after their bankruptcy filing did not violate the automatic stay, they requested OCA to re-open the case as to the 21 complaints they failed to defend, but their request was unfairly denied. They label the OCA's determination as "impermissible posturing," Heller Aff. at ¶ 16, and argue that OCA's professed need to examine individual

cases is not cause to extend the time to object to discharge. The Court disagrees.

It is true that OCA could immediately file a complaint with respect to both the penalty owed to it, and with respect to any allegations arising from the 21 complaints it has already investigated. However, OCA has received 60 complaints against the Debtors—the majority of which were filed within a month or two of the bankruptcy filing—and some of which were dated after the filing. The Court sees little to be gained by requiring OCA to file an immediate complaint with respect to claims it has investigated, granting it an extension of time to investigate the others, and then requiring OCA to file a second complaint after its investigation has concluded.

In addition, the Court is unwilling to find, at this point, that the need to interview individuals is cause to grant OCA an extension of time to file a complaint under section 523, but not under section 727. The Court has no idea what facts OCA's investigation will uncover, or whether those facts would form the basis for an objection to discharge.

Accordingly, OCA has established "cause" to extend its time to file a complaint under both section 523 and section 727.

### III. The Need for an Adversary Proceeding to Determine Dischargeability Pursuant to 11 U.S.C. § 523(a)(7)

Following oral argument, the Court requested supplemental submissions to address the parties' respective positions concerning the dischargeability of the civil penalty assessed pursuant to the Decision. OCA argues that the penalty constitutes a penalty payable to and for the benefit of a governmental unit and, as such, is "automatically non-dischargeable and a governmental unit is not required to institute an adversary proceeding under 11 U.S.C. § 523(c) to determine the non-dischargeability of these penalties." Letter of Janice Whelan, Esq., dated Oct. 24, 1995. The letter concludes with a request that this Court issue an Order declaring that any civil penalty which has been or will be assessed by Citizens Affairs against the debtor is automatically non-dischargeable under 11 U.S.C. §§ 523(a)(7) and 523(c).

The Debtors contend that since Fed. R. Bankr.P. 4007 [16] states that a complaint other than one under § 523(c)—which governs complaints under §§ 523(a)(2), (4), (6) and (15)—may be filed at any time, the inference arises that a complaint must be filed under § 523(a)(7) [17].

The import of the Code and Rules, when read together, is that a complaint under §§ 523(a)(2), (4), (6) and (15) must be filed within 60 days following the creditors' meeting (unless a request for an extension of time was made within this period); if not, then debts of those kind are discharged. Therefore, if a creditor has any ground to except his debt from discharge under one of those subsections, he must file a timely complaint or forever lose his rights. However, § 523(c)(1) and Rule 4007(c) make clear that a creditor holding grounds to except his debt from discharge under any of the other subsections of § 523(a) need not file a complaint

---

**16.** Federal Rules of Bankruptcy Procedure 4007(b) and (c) provide:

 (b) Time for Commencing Proceeding Other Than Under § 523(c) of the Code. A complaint other than under § 523(c) may be filed at any time. A case may be reopened without payment of an additional filing fee for the purpose of filing a complaint to obtain a determination under this rule.

 (c) Time for Filing Complaint Under § 523(c) in Chapter 7 ... Cases; Notice of Time Fixed. A complaint to determine the dischargeability of any debt pursuant to § 523(c) of the Code shall be filed not later than 60 days following the first date set for the meeting of creditors held pursuant to § 341(a). The court shall give all creditors not less than 30 days notice of the time so fixed in the manner provided in Rule 2002. On motion of any party in interest, after hearing on notice the court may for cause extend the time fixed under this subdivision. The motion shall be made before the time has expired.

**17.** 11 U.S.C. § 523(a)(7) provides:

 (a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt-

 ***

 (7) to the extent such debt is for a fine, penalty, or forfeiture payable to and for the benefit of a governmental unit, and is not compensation for actual pecuniary loss....

within 60 days, and his failure to do so will not result in the automatic discharge of the debt. Rather, the Rule provides that a complaint may be filed at any time, and the case may even be reopened for that purpose. *See In re Riley*, 202 B.R. 169, 177 (Bankr. M.D.Fla.1996) (holding that there is no time limit for filing complaint pursuant to Section 523(a)(7)).

The effect is to grant the bankruptcy court exclusive jurisdiction to determine the dischargeability of debts under paragraphs (2), (4), (6) and (15) of § 523(a), but concurrent jurisdiction with respect to debts falling within the other paragraphs of § 523(a). *In re Szczepanik*, 146 B.R. 905 (Bankr.E.D.N.Y.1992) (Goetz, J. (ret.)). The dischargeability of debts under paragraphs other than (2), (4), (6) and (15) of § 523 may be determined at any time, in any forum. *Adam Glass Service, Inc. v. Federated Department Stores, Inc.*, 173 B.R. 840, 843 (E.D.N.Y.1994).

OCA relies upon *Kelly v. Robinson*, 479 U.S. 36, 107 S.Ct. 353, 93 L.Ed.2d 216 (1986), *In re Taite*, 76 B.R. 764 (Bankr. C.D.Cal.1987), *In re Kelly*, 155 B.R. 75 (Bankr.S.D.N.Y.1993), and *In re Sokol*, 170 B.R. 556 (Bankr.S.D.N.Y.1994), *aff'd*, 181 B.R. 27 (S.D.N.Y.1995), for the proposition that it need not file an adversary proceeding to determine the dischargeability of the debt owed to it under § 523(a)(7). It is true that each of those cases contains language stating that such debts are "automatically nondischargeable." However, in each case an adversary proceeding had, in fact, been filed, and each case was decided within that context. The Court therefore believes that each court used the phrase "automatically nondischargeable" somewhat loosely as *dictum* and, when taken out of context, the phrase implies a result which the Court believes was not intended.

The cases which have considered the issue directly have spoken virtually in unison: a creditor need not file an adversary proceeding to determine the dischargeability of debt under § 523(a)(7) within the 60 day period and, in fact, need not file one at all. Rather, the creditor is free to pursue its claim in another forum, such as a state court, which

has concurrent jurisdiction. A debtor, faced with the pursuit of such a claim, may raise the discharge as an affirmative defense and the state tribunal may make its determination. Or, the debtor may return to the bankruptcy court, re-opening his case if necessary, to obtain a determination here. *In re Szczepanik, supra*, 146 B.R. 905.

But a creditor who fails to file an adversary proceeding, while not precluded from pursuing his debt elsewhere, is not entitled to a judicial determination by a bankruptcy court that the debt is nondischargeable. *In re Ganous*, 138 B.R. 110 (Bankr.S.D.Fla. 1992); *In re Bingham*, 163 B.R. 769 (Bankr. N.D.Tex.1994). The reason for such a rule is obvious: Section 523(a)(7) only excepts from discharge debts which are payable to and for the benefit of a governmental unit, which are not compensation for actual pecuniary loss. Where the matter is disputed—regardless of whether or not a particular debt meets those two elements—it must be judicially determined, and all parties must be afforded due process before such a determination can be made. The due process required is set forth in Fed. R. Bankr P. 7001, *et seq.*

In short, OCA need not file an adversary proceeding to determine dischargeability under § 523(a)(7). But absent such a proceeding, this Court will not issue a judicial declaration that the debt owed to it is nondischargeable.

### CONCLUSIONS.

1. The Court has jurisdiction over the subject matter and the parties to this core proceeding pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157(b)(2). Venue is proper. 28 U.S.C. § 1408.

2. OCA has standing, under 11 U.S.C. § 523(c), to commence a proceeding to determine the dischargeability of debt as set forth above.

3. OCA has standing under the doctrine of *parens patriae* to commence a proceeding to determine the dischargeability of debt as set forth above.

4. OCA has established "cause" for an extension of time to object to discharge and/or to determine dischargeability.

5. OCA need not file an adversary proceeding in this Court to determine the dischargeability of debt pursuant to 11 U.S.C. § 523(a)(7). But absent such a proceeding, the Court declines to enter an order determining the debt to be non-dischargeable.

For all of the foregoing reasons, OCAs motion is granted. The time within which OCA may file a complaint objecting to discharge or excepting debts from discharge is fixed at November 28, 1997.

**SO ORDERED.**