**In re Gerald and Judith BUCHFERER, Debtors.**

**Bankruptcy No. 897-82269-288.**

United States Bankruptcy Court, E.D. New York.

Dec. 29, 1997.

cause the debtors, Gerald and Judith Buchferer, propose to repay outstanding loans to a pension plan in full and not repay their unsecured creditors in full. For the reasons set forth in this opinion, the objection is overruled and the plan is confirmed.

## II. Background:

Mr. Buchferer has been employed for thirty years by the New York City Board of Education (Board). He supplements his $60,000 annual salary from the Board as a part-time and self-employed franchisee of an insect control service. Mrs. Buchferer lost her job and remains unemployed.

Part of Mr. Buchferer's compensation and benefits package from the Board is participation in a defined contribution plan. The plan is regulated under an elaborate and comprehensive state statute covering pension plans for various types of public employees. Retirement and Social Security Law Sec. 613 *et seq.* (McKinney's Supp.1997) (Retirement Act). Under section 613–a(a) of the Retirement Act, "a member of the teachers' retirement system in active service" may borrow up to 75% of his vested contributions. The borrower is obligated to repay the loan, with interest accruing at a rate prescribed under the Retirement Act, within five years through equal installments paid either directly to the retirement system or through payroll deductions. Under section 613–a(k) of the Retirement Act, the retirement system (retirement system or plan administrator) is expressly precluded from bringing suit against the borrower in the event of nonpayment due to "death, retirement or withdrawal" as a teacher. Its sole remedy is "to **offset** the amount outstanding including interest **from the member's account or other benefits.**"

With the loss of income from Mrs. Buchferer's former job, the debtors found it very difficult to meet their outstanding and recurring financial obligations. Under these circumstances, Mr. Buchferer entered into a series of annual loan transactions with the retirement system. The loan proceeds were

Robert Arbeit, Pinks & Arbeit, Hauppauge, NY, for Debtors.

Sanford I. Weinberg, Rockville Centre, NY, Chapter 13 Trustee.

## MEMORANDUM AND ORDER CONFIRMING CHAPTER 13 PLAN

STAN BERNSTEIN, Bankruptcy Judge.

## I. Issue:

The chapter 13 trustee objected to the confirmation of a chapter 13 plan solely be-

used to reduce their outstanding indebtedness. Nonetheless, those loans proved to be inadequate. After struggling for a few years, the debtors then decided to seek relief under chapter 13. As of December 31, 1996, Mr. Buchferer's outstanding principal balance on his pension loans was $30,268.78. If paid as agreed, the maturity date of some of the earlier loans will fall within the five-year term of the debtors' plan.

At the time of their filing, the debtors were current on their first and second mortgage loans against their residence in Dix Hills, New York. Their Long Island suburban property was valued at $215,000; the balance of the liens was $192,000. The modest equity is exempt from execution as a matter of New York State law—$20,000 as a joint household exemption for husband and wife. In addition, they carried a modest balance under a secured loan for a 1992 car. They were also liable under a 36–month lease for a second car, a BMW, leased in 1995. (The trustee's objection to the debtors' continuing to pay the BMW lease has been dealt with in a separate opinion.)

The debtors had incurred $80,000 in aggregate unsecured indebtedness on their credit cards to several retailers such as Saks, Sterns, Bloomingdale's, Sears, and Filene's as well as to several general consumer credit card issuers such as American Express, AT & T Universal Card, Chase, Citibank, Discover Card, and MBNA.

Under their schedules of income and expenses, the debtors included the amount of $1,030 as a monthly expense, deducted from Mr. Buchferer's salary, to pay his outstanding pension loans. After all other monthly expenses were deducted from his net income (gross income less federal and state tax and other withholdings for health insurance, etc.), the debtors' joint 'disposable income' was $275. After making a further $75 adjustment for contingent or discretionary expenses, the plan committed $200 a month for sixty months for payments to unsecured creditors. Unsecured creditors who timely filed proofs of claim were to receive a 14.4% dividend (without present value interest). In this instance, the schedules of claims listed by the debtors were very accurate. With two minor exceptions, all the scheduled creditors filed proofs of claim, and the claim amounts were close to the scheduled amounts.

## III. The Positions of the Parties:

### A. The Trustee's Objections to Confirmation.

In connection with the confirmation hearing, the trustee filed a multi-part objection to the plan:

1. The debtor's indebtedness to his pension plan cannot be counted as a 'debt' under the Bankruptcy Code (Code);

2. Even if (1) is not the case, nevertheless, the indebtedness to the pension plan cannot be dealt with under (or outside of) the debtor's chapter 13 plan because this deduction from net income is not a "reasonably necessary" expense for the "maintenance and support of the debtor or a dependent of the debtor" under section 1325(b)(2)(A) of the Code;

3. Even if (1) and (2) are not the case, the proposed payment of the entire indebtedness to the pension plan during the term of the plan would result in an unfair discrimination under section 1322(b) of the Code because unsecured creditors will only be paid a pro-rata 14.4% dividend, yet the plan administrator will be paid in full;

4. The only means available to eliminate this type of unfair discrimination is for Mr. Buchferer to agree to reborrow the principal balance of his pension loans as they existed on the petition date and to distribute that amount to the unsecured creditors under the plan; and

5. If the debtors do not agree to (4), then the case must be dismissed for their failure to propose a feasible plan that satisfies the criteria for confirmation under section 1325 of the Code.

### B. The Debtors' Reply.

1. The trustee's position is contrary to the legislative intent of encouraging debtors to file for relief under chapter 13 cases;

2. The trustee's proposal in (4) above imposes a Hobson's choice upon the debtors. Once Mr. Buchferer commits all of his disposable income to the plan, he has no other means to repay the increased loan balance. Without this further borrowing capacity, he cannot satisfy the trustee's condition for confirmation. The logical implication from the trustee's objection is that no person who has an outstanding loan to his pension fund can obtain relief under chapter 13 even though that person has committed all of his disposable income to his unsecured creditors for 60 months. This outcome cannot possibly be consistent with the intent of Congress;

3. If the trustee means that Mr. Buchferer has to borrow $30,300 as soon he has completed the installment payments on his prepetition loans, the debtors object that the trustee has no authority under the Code to impose an involuntary loan upon the debtors as a condition to confirmation;

4. If the thrust of the trustee's objection on classification is that the debtors cannot repay their pension loans in full unless they also pay their unsecured indebtedness in full, then the trustee's demand that Mr. Buchferer is required to reborrow $30,300, the amount of the pension loans, is inconsistent with his objection because the filed unsecured claims are approximately $80,000. In order to satisfy the trustee's requirement of a 100% plan for unsecured creditors, the debtors would have to borrow $80,000 from the retirement system, and repay that within five years—an impossible task;

5. The trustee's objection is critically defective as a matter of law because the pension loan is a nonrecourse secured claim and there is no authority under the Code for the disallowance of this type of claim. As a nonrecourse secured claim, it cannot be classified with the allowed unsecured claims; therefore, there is no unfair discrimination under the plan; and

6. In this case, the debtors cannot continue to carry their obligations, so dismissal of their chapter 13 petition is not a fair nor a practical alternative. Moreover, not only would the trustee wrongfully impair the Buchferers' right to file for chapter 13 relief, but if they filed for relief under chapter 7, all of their assets, with the exception of Mrs. Buchferer's diamond engagement ring, valued at $10,400, would be exempt from liquidation by the trustee. After expenses of administration in the chapter 7 case, the unsecured creditors would receive substantially less than the 14.4% on their allowed claims proposed under the chapter 13 plan. (In making this comparative calculation, one would have to discount the stream of future payments under the plan to the date of a chapter 7 trustee's distribution.) An involuntary conversion by the debtors from chapter 13 to chapter 7 in this circumstance prejudices the unsecured creditors as well.

In order to reduce briefing costs, both parties were urged to review the relevant sections from the comprehensive three-volume treatise by the Hon. Keith M. Lundin. *Chapter 13 Bankruptcy* (Wiley Law, 2nd ed. 1996, with suppl.), cite these sections to the Court, and add whatever other arguments they believed persuasive in a short memorandum of points and authorities. The trustee complied with this suggestion; the debtors preferred to rest upon their counsel's oral advocacy at the contested confirmation hearing.

IV. Discussion:

A. The Plain English Provisions of the Bankruptcy Code.

1. Introduction.

The chapter 13 trustee's first objection is grounded in what he believes is a logical extension of the case authority from this circuit. In *New York City Employees' Retirement System v. Villarie*, 648 F.2d 810 (2d Cir.1981), the Court of Appeals held that a debtor's loan against his pension fund is not a debt, and is, therefore, not subject to discharge in a chapter 7 case. Some bankruptcy judges in this circuit have extended the application of this same concept of 'not-a-debt' to chapter 13 plans which propose the repayment in full of pension loans without a concomitant commitment to pay all unsecured creditors in full. See *In re Delnero*, 191 B.R. 539 (Bankr.N.D.N.Y.1996); *In re Goewey*, 185 B.R. 444 (Bankr.N.D.N.Y.1995) (applying *Villarie* in chapter 13 case). Simi-

**336**

lar holdings may be found in reported decisions from other circuits. See, e.g., *In re Fulton,* 211 B.R. 247 (Bankr.S.D.Ohio 1997) (collecting cases). This Court declines to extend *Villarie* to chapter 13 cases.

 *Villarie* held that a common form of debt outside of bankruptcy is not debt inside of bankruptcy. One should always be wary whenever a perplexing legal issue is disposed of by a definition that runs contrary to the usage of a common word in ordinary language and business practice. Furthermore, our canons or principles of construction stand for the proposition that whenever deciding complex issues of statutory construction arising under a **codified federal law,** judges must be rigorous in their treatment of fundamental concepts such as 'debt' or 'claim' under the Code. In this sense, the fundamental defining or axiomatic concepts are entitled to very great deference when judges construe and apply a codified federal law. The chapter 13 trustee's multi-part objection on the pension loan is not supported by a plain reading of applicable provisions of the Code. In matters of statutory construction, the United States Supreme Court has repeatedly stressed that a proper construction of the Code mandates identifying the relevant provisions and applying the **plain language** of the terms within those provisions to the issues of law raised by the facts of the case. Courts are enjoined, as it were, from revisiting the legislative history to these provisions unless the key terms in these provisions are ambiguous or, if read strictly according to their plain meaning, lead to an absurd result. See, especially, *Toibb v. Radloff,* 501 U.S. 157, 160, 111 S.Ct. 2197, 2199, 115 L.Ed.2d 145 (1991) (sustaining the right of an individual debtor to file for relief under Chapter 11 under the plain language of the Code despite repeated and contrary comments in the legislative history restricting chapter 11 to debtors who operated businesses). See also *Pennsylvania Dep't of Public Welfare v. Davenport,* 495 U.S. 552, 110 S.Ct. 2126, 109 L.Ed.2d 588 (1990); *United States v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989).

 In this case, as the following presentation will show, the relevant provisions of the Code are readily identifiable. No crucial terms are ambiguous. Resort then to legislative history is not available as a tool of statutory construction. The particular issue in this case—the treatment of prepetition pension plan loans—is raised with some frequency in the confirmation of chapter 13 plans on this Court's docket. Therefore, a thorough presentation of the proper construction of the Code sections is necessary at the risk of appearing didactic.

Let us begin with the concept of 'debt' because the chapter 13 trustee contends that this pension loan is not a 'debt' under the Code. This contention, on its face, seems to make little sense. If we look to New York State law, how can there be a bona fide argument that the pension loans are not a 'debt?' Under the Retirement Act, and as evidenced in Mr. Buchferer's annual statements from the retirement system and in his pay stubs, the installment of his pension loans are paid through an automatic deduction from his bi-weekly pay check. How can a valid debt under applicable state law be transmitted (or transmogrified) into something that is not a debt under federal bankruptcy law?

The chapter 13 trustee does not contend that the loan payments are subject to recovery from the retirement system as an avoidable prepetition transfer under sections 554, 547, or 548 of the Code. Nor has the chapter 13 trustee suggested during argument on this contested matter that if the pension plan administrator were to file a proof of claim, that he would object to the claim as disallowable under section 502 of the Code. (Section 502 is the general section that sets forth the detailed alternative criteria for objecting to a proof of claim.) As will become clear further in this analysis, as a matter of law, the retirement system has no express nor implied duty or obligation under the Code or the Federal Rules of Bankruptcy Procedure to file a proof of claim to preclude its claim from discharge.

2. Sections 101(5), (10), (12), and 102(2).

By definition, a 'debt' is simply 'liability on a claim' under section 101(12). That is the

entire definition. The Code offers no further criteria for identifying a debt. Congress must have concluded that the meaning of 'debt' in ordinary linguistic usage is so well understood that the term does not require any further elaboration. More importantly, the draftsmen of the Code preferred to focus their attention on *defining the correlative and co-extensive term 'claim'* under section 101(5) and stipulating a rule of construction for the fundamental term 'claim' under section 102(2).

Under section 101(5), a "claim means—(A) a right to payment ..." The Second Circuit has recently had the occasion to stress the broadness of the term 'claim' and that it is the correlative of the term 'debt.' See *Mazzeo v. U.S. and N.Y. State (In re Mazzeo)*, 131 F.3d 295 (2d Cir.1997) (construing 'contingent' claim in determining the debt limits for a chapter 13 filing).

The definition of 'claim' says absolutely nothing about the **source** of payment to satisfy the claim. It is true that the definition of 'creditor' under section 101(10) adds to the term 'claim' the words "against the debtor." Without either more thoughtful analysis or consideration of the applicable Rule of Construction under section 102(2), a reader might draw a misleading and illogical inference that the definition of 'creditor' limits the universe of 'claims' to a subset of 'claims-against-the-debtor.'

One of the seven Rules of Construction for the Code, as set forth in section 102(2), expressly provides that " 'claim against the debtor' includes claim against the property of the debtor." This use of the verb "includes" in this context means that 'claim against property of the debtor' constitutes a sub-set of 'claims against the debtor.' **In other words, if one holds a claim against property of the debtor, then one holds a claim against the debtor.** Anyone who loses sight of this critical relationship for even the briefest moment will get hopelessly lost in the thorny thicket of the Code.

Mr. Buchferer does not assert that he has incurred a personal liability to the plan administrator. Quite to the contrary, he readily acknowledges, as he must, that the Retirement Act grants the retirement system the right to offset his vested plan account if he terminates his employment with the Board while there is an outstanding balance due under his loans. In other words, termination of employment results in an acceleration of the loan balance. At that point, the retirement system has the express and unimpaired right as a matter of New York State law to offset the balance due from his plan account. By providing for the retirement system's right to exercise a setoff against the debtor's property interest under the plan, New York State law confers the status upon the retirement system of a holder of a secured claim against the debtor.

### 3. Sections 553(a) and 506(a).

Other Code provisions lend direct support to the proposition that the plan administrator holds a secured claim against the property of the debtor. Section 553 of the Code deals with a creditor's right of setoff, assuming that the right arises under applicable state or federal nonbankruptcy law.

The phrasing of section 553(a) is not felicitous, but it states in relevant part:

> [T]his title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case, except to the extent that—
>
> > (1) the claim of such creditor against such debtor is disallowed ...

11 U.S.C. sec. 553(a).

As noted above, the plan administrator holds a right of offset against property of the debtor, and the chapter 13 trustee has raised no ground for finding that the claim is disallowable under any explicit sub-section of section 502 of the Code or applicable state or federal nonbankruptcy law.

Section 506(a) reiterates the rule that the creditor's right of setoff gives rise by operation of law to a secured claim that is cognizable under the Code. This provision, again in phrasing that is not felicitous, states in relevant part:

An allowed claim of a creditor ... that is subject to setoff under section 553 of this title[,] is a secured claim to the extent ... of the amount subject to offset.

11 U.S.C. sec. 506(a).

Reading these provisions of the Bankruptcy Code together, the retirement system holds a secured claim in any bankruptcy case filed by the borrower. That the debtor cannot be held personally liable for the repayment of this loan, as a matter of underlying state or federal nonbankruptcy law, is irrelevant to the determination of whether the retirement system holds a valid secured claim in a bankruptcy case.

### 4. Right of Setoff.

The setoff remedy of the retirement system is an offshoot of a deeply rooted common-law remedy in the banking industry. Under common law, a banker's lien shares many of the characteristics of a secured loan transaction. When a depository customer of the bank wishes to borrow from the bank, he can arrange for a 'signature loan.' The bank may then make a loan or advance to its customer, relying upon not only the character and reputation of the borrower for repaying debts and other obligations, but also upon the bank's common law right to offset the borrower's depository account in order to satisfy the loan if its terms are breached. To the extent that there is a balance in the borrower's checking or savings account, that account stands as collateral for the repayment of the loan. In this respect, the bank has 'recourse' to the borrower's deposit account, effected by means of exercising the right or remedy of setoff. The courts at all levels in the state and federal judiciary have long recognized that the bank holds a secured claim for all legal and practical purposes (as long as the debtor does not withdraw all 'funds' on deposit before a default is declared to defeat the exercise of the remedy of setoff.)

It is, therefore, not surprising that the retirement system's right of setoff against the participant's vested plan account is also entitled to be characterized as a nonrecourse loan remedy. In this instance, the retirement system has no right to assert a claim against the person of the debtor, but it most assuredly has a right against the debtor's property, namely, his vested interest in his plan account, should the borrower default. (It is very doubtful that the retirement system would ever permit a plan participant with an outstanding loan balance to withdraw or liquidate his plan account and thereby defeat the exercise of the remedy of setoff.)

When one considers the billions of dollars invested in public and private employee pension plans, the tight limitations by federal regulation (and in this case, state regulation) imposed upon the plan participant's borrowing against his account, and the hundreds of millions of dollars in nonrecourse loans which are outstanding in any given year in the United States, this is a domain in which all courts should tread very, very lightly to avoid disrupting customary business expectations. It is a defining characteristic of these pension loan transactions that recourse may only be had to the participant-borrower's vested account. See especially 29 CFR Ch. XVII, Section 2550.408b–1(f) ("Adequate Security").

### 5. Recourse and Nonrecourse Loans.

It may be easier to understand the special nature of this claim held by the retirement system, if one appreciates that the claim of the retirement system is one of the species of a class, genus or family of contemporary lending practices referred to a 'nonrecourse secured claims.' To understand the thrust of this concept, one should ask: Under what conventional arrangements would a secured creditor have a claim only against property of the debtor?

For ease of analysis, we begin with the more common secured loan transaction structured and formally classified as a 'secured loan with recourse against the debtor.' The most common is a secured loan transaction under which the debtor grants a security interest in his property to secure the payment of the loan. In most transactions, the debtor is personally liable on the indebtedness, and the secured creditor has the right either (i) to foreclose against the collateral and collect any deficiency against the non-exempt assets of the debtor, including his

future disposable income, or (ii) to sue to collect the entire indebtedness from the debtor and his non-exempt assets and not foreclose on the collateral. In this transaction, the secured creditor has a claim (in the form of a remedy or 'recourse') both against the 'person' of the debtor and against the 'property of the debtor'. 'Property of the debtor' includes both (i) the debtor's interest in specific collateral in which the creditor is granted a consensual security interest or mortgage lien, and (ii) the debtor's interest in other property which may become subjected to the involuntary lien of a judgment creditor to the extent that other property is not exempt from execution under applicable state or federal nonbankruptcy law.

Less common is a secured loan transaction under which the only remedy the creditor is granted is the right to collect the indebtedness from property of the debtor. In this form of loan transaction, since the creditor has no right (or 'recourse') to assert a liability against the person of the debtor, it is referred to as a 'nonrecourse loan.' All that means is that the creditor has 'no recourse' against the person of the debtor. Quite to the point, the lender does have 'recourse,' but that recourse is limited to the collateral, i.e., the property of the debtor that secures the repayment of the loan.

Nonrecourse loan transactions are common in sophisticated commercial lending transactions. In permanent mortgage loans to real estate partnerships which develop office buildings, apartment houses, or other commercial income-producing facilities, the general partner and the general partnership frequently negotiate for a release of personal liability or a covenant not to sue the general partner(s) or the partnership itself. Those loans are commonly referred to as 'nonrecourse' loans. The lender has recourse to the underlying under a mortgage lien against real property, fixtures, the physical improvements, and usually the rents from the project under an assignment of rents as collateral.

In several state jurisdictions, state laws have limited residential mortgage lenders to nonrecourse transactions. For many years, for example, the State of Arizona prohibited the imposition of any personal liability for a deficiency under a first deed of trust loan. Presumably the implicit assumption was that in the southwest, with decades of annual population growth and a lagging supply of housing, the appreciation in market values would always protect the deed of trust lender. In the late 1980's, when virtually all of the deregulated 'thrifts' failed in Arizona due to their phenomenally poor underwriting standards and gross undercapitalization, that assumption was sorely tested and failed in practice. Many homeowners in Arizona who lost their jobs in the finance and service industries defaulted on their deed of trust loans and either negotiated 'short sales' under deed in lieu arrangements or waited until they were evicted following a foreclosure sale. As a result, there was a substantial meltdown in the value of residential properties, whether detached residences or condominiums. Other jurisdictions like California adopted 'single or one action' rules that effectively rendered first trust deed loans as nonrecourse loans. The lender was put to a hard choice: (i) either sue for the entire indebtedness under the note and 'waive recourse against the lien' or (ii) foreclose on the property and waive any personal liability against the borrower for a personal deficiency. Unless the borrower had sufficient assets beyond his residence, the choice is illusory, for the lender has to foreclose on the property to recover any substantial part of the loan.

This same structure of nonrecourse loans has been greatly expanded over the past twenty years in 'project financings' of electric-power generating or co-generation plants. The next generation of nonrecourse loans extended to the 'asset securitization' loans for the financing of portfolios of the commercial leases covering anchor stores of national retail and wholesale chains like Kmart and Sears, and of the chattel paper of national consumer finance companies like General Motors Acceptance Company or Ford Motor Credit Company arising from the financing of cars and trucks to consumers.

6. Other Creditors with a Family Resemblance.

To continue introducing creditors who bear a family resemblance to other holders of

nonrecourse secured claims, one may also consider the involuntary secured or lien claim of the Internal Revenue Service. If the IRS has levied upon property of the debtor, and that debtor then files first for relief under chapter 7, then, subject to the exceptions of section 523(a)(1), any personal deficiency for that tax liability may also be discharged, resulting in a nonrecourse claim against those assets of the debtor subject to a proper levy. Then the tax lien may be dealt with in a subsequently filed chapter 13 case. The same analysis would apply to judgment liens recorded against the debtor's property, assuming that these liens could not be avoided as an impairment of a debtor's exemption under section 522(f).

### B. The Decisions of the Supreme Court.

In light of contemporary lending practices, it becomes readily apparent that by focusing too narrowly on the definition of 'claim' and not applying the rules of construction under the Bankruptcy Code to 'claim,' the chapter 13 trustee failed to identify the pension loan as a nonrecourse secured claim in the first instance. Moreover, the trustee did not consider sufficiently the controlling precedents of the United Supreme Court which trace the expanding boundaries of the concept of 'claim' and explicate the meaning of the related concept of 'nonrecourse claim.'

Over the last ten years, the United States Supreme Court has carefully scrutinized the definition of 'claim' under the Bankruptcy Code in several leading opinions. In some respect, this may be a by-product of a greater deference by the Court to the 'grammatical' rules governing the construction of statutory texts, called the 'plain language approach.' During this same time, the Supreme Court has, however, also taken pains to emphasize the broad scope to the fundamental concept of a 'claim.' In *Ohio v. Kovacs*, 469 U.S. 274, 105 S.Ct. 705, 83 L.Ed.2d 649 (1985), the Court had to determine whether a 'claim' arose under the Code against the controlling person of a corporation under the terms of affirmative injunctive relief requiring him to clean up a toxic waste site owned by his corporation. In approaching that definitional issue, the Court

began by stressing that "Congress desired a broad definition of claim." 469 U.S. at 279, 105 S.Ct. at 708. The Court reiterated this theme in *Pennsylvania Dep't of Public Welfare v. Davenport, supra,* in which it held that the borrower had incurred a 'debt' for purposes of the Code arising from his obligation to pay restitution as a condition of probation under a criminal conviction for welfare fraud. That debt gave rise to a 'claim' held by the Welfare Department under the Code. As noted above, the Second Circuit has recently relied upon the *Davenport* definition of 'debt' in *In re Mazzeo, supra.*

Many academic commentators and treatise writers concur that it is a sign of the growing maturity and increasing utility of the Bankruptcy Code that the restructuring of debtor-creditor relations in the last decades of the twentieth century is manifested in the broadening scope of the concept of a 'claim.' *See passim* National Bankruptcy Conference, *Report of the Code Reform Project* (1995) and *Report of the National Bankruptcy Review Commission,* (1997). In some respects, the concept may have become so protean in character that some commentators now raise the legitimate concern that not every conceivable thing in the universe necessarily falls within the definition of claim. But that concern turns on whether 'future mass tort claims' or remote 'products liability claims' may be discharged under a chapter 11 plan of reorganization, and not whether the loans of an individual borrower from a pension fund, which is qualified as tax-deferred under the Employment Retirement Investment Security Act, are claims in a chapter 13 (or chapter 7) case.

The trustee's first objection—that the pension loan is not a debt—misses the entire thrust of the teaching of United States Supreme Court in *Johnson v. Home State Bank,* 501 U.S. 78, 111 S.Ct. 2150, 115 L.Ed.2d 66 (1991), that a debtor can incur an indebtedness in the form of a nonrecourse loan, and that a nonrecourse loan satisfies the definition of a 'claim' under section 102(2):

> [I]nsofar as Congress did not expressly limit section 102(2) to nonrecourse loans

but rather chose general language broad enough to encompass such obligations, we understand Congress' intent to be that section 102(2) extend to all interests having the relevant attributes of nonrecourse obligations regardless of how these interests come into existence.

501 U.S. at 86–87, 111 S.Ct. at 2155.

Perhaps because of the different context in which *Johnson* arose, the chapter 13 trustee did not hear the mighty roar of this freight train. As the Supreme Court pointed out in *Johnson*, whenever a debtor files for relief under chapter 7, any personal liability arising from a deficiency in a mortgage foreclosure would be subject to a discharge, but under the pre-Code case law, captured by *Long v. Bullard*, 117 U.S. 617, 6 S.Ct. 917, 29 L.Ed. 1004 (1886), the "lien rides" through the chapter 7 case. If there is a default in the mortgage, enforceable against the collateral, that is the remedy of the lender who now has only a nonrecourse loan in its portfolio. In *Johnson*, the debtor incurred a mortgage loan on his farm, with recourse to his non-exempt assets, and then filed a chapter 7 petition. The stay was lifted, and the lender was about to foreclose, but the debtor filed a chapter 13 petition. The lender's argument that the lien balance was not a 'claim' that could be dealt with under the chapter 13 plan was soundly rejected by the Supreme Court. The transmuted nonrecourse indebtedness was decidedly a claim against the debtor or property of the debtor.

In *Citizens Bank of Maryland v. Strumpf*, 516 U.S. 16, 116 S.Ct. 286, 133 L.Ed.2d 258 (1995), a few later, the Supreme Court also recognized that a banker's remedy of setoff should be viewed as holding a lien against the borrower's checking or savings account balance. That means that the bank's claim is a secured claim to the extent of the balance in the debtor's checking or savings account. Although it is true that the bank usually retains the right to sue the defaulting borrower for his personal liability under the note, for purposes of construing the Code, the plan administrator's right of setoff is on logical all fours with a banker's remedy of setoff.

Again because of the institutional context in which *Strumpf* arose, the chapter 13 trustee did not perceive the applicability of this decision to his present case. *Strumpf* is, no doubt, a truncated opinion. The issue of the banker's remedy of setoff arose with a high degree of frequency in litigation over the imposition of an 'administrative freeze' of the borrower's bank account after the borrower filed for bankruptcy relief. The debtors' bar argued that the 'administrative freeze' violated the automatic stay. The lenders' bar countered that the balance in the bank account was 'cash collateral' under section 363 for which the bank was entitled to be paid at least 'adequate protection' under section 361 as a secured creditor. The administrative freeze simply operated to maintain the status quo by preventing the debtor from withdrawing the balance of the account and thereby annulling the remedy of setoff. Most of the courts of appeals had issued lengthy and conflicting opinions on this subject. In *Strumpf*, the Supreme Court resolved the conflict among the circuits and sustained the position of the banks. For an exhaustive (but now dated) analysis of the treatment of the right of setoff under the Code before *Strumpf*, as it pertains to a banker's lien, see D. Epstein, S. Nickles, & J.J. White, 1 *Bankruptcy* Secs. 6–38 through 6–43 (West 1992); see also the retrospective analysis in 5 *Collier on Bankruptcy* Ch. 553 (Matthew Bender, 15th rev. ed. 1997).

All this supports the conclusion that there is an extended family of nonrecourse lien creditors, including pension plan administrators, whose claims can be dealt with under a chapter 13 plan. That is the central teaching of *Johnson*.

C. Satisfying the Claim from Postpetition Income.

■ The trustee's second, and based upon the intensity of his advocacy, his principal objection to the debtor's chapter 13 plan is to the debtor's continuing to pay the monthly amount due under his note to the pension plan administrator from the debtor's postpetition income. As *Johnson* pointed out, it does not, **and cannot,** matter that a non-exempt asset of the debtor (i.e., postpetition

disposable income) is used to satisfy the pension loan. A chapter 13 debtor can treat a nonrecourse claim under a plan, and that includes satisfying that claim during the term of the plan from the debtor's postpetition disposable income. That is exactly what the debtor in this case propose to do by continuing to have the monthly deductions for payments to the pension plan from Mr. Buchferer's salary.

### D. Unfair Treatment of Unsecured Claims.

The trustee's related third objection is that the debtors' plan, by proposing to repay the pension loans in full during the term of that plan, 'unfairly discriminates' against the class of unsecured creditors. To support this objection, the trustee ultimately relies upon the decision of the Sixth Circuit. *In re Harshbarger* 66 F.3d 775 (6th Cir.1995). That court sustained the denial of confirmation of a chapter 13 plan when the debtor proposed to repay his pension loan in full from his postpetition income while proposing to pay the class of unsecured creditors less than 100% on their claims:

> It is unfortunate that Ms. Harshbarger's expected pension benefits may be diminished by a future setoff against the unpaid portion of her obligation to the ERISA-qualified account. However, this consideration does not alter the result under the bankruptcy laws. In these circumstances, 'it would be unfair to the creditors to allow the Debtors in the present case to commit part of their earnings to the payment of their own retirement fund while at the same time paying their creditors less than a 100% dividend.' *In re Jones*, 138 B.R. 536, 539 (Bankr.S.D.Ohio 1991)....

66 F.3d at 777.

██ As a matter of bankruptcy law, there can, however, be no 'unfair discrimination' in treating differently classes of claims that by virtue of their 'state law entitlements' are different. It is not 'unfair discrimination' under the plan for the debtor to pay a secured claim in full, while paying the class of unsecured claims less than their full amounts. Moreover, since the debt to the pension fund is a secured claim, the fact that

it will be paid in full under (or outside) the plan is also legally irrelevant.

Even from the standpoint of criticizing the debtor who tries to repay "himself" in connection with a pension loan, the *Harshbarger* opinion is not persuasive. First of all, the payee under the note is not the debtor; it is the plan administrator who has fiduciary duties to the beneficiaries and all other participants in the plan. In many plans, dealing with the plan administrator is a lot tougher, in fact, for the debtor than dealing with the debtor's friendly local banker. The plan administrator is bound tightly by federal (or state) regulations as to the amount that can be borrowed, the terms of the loan both as to interest rate, the duration of the repayment period, and the consequences of default or termination of employment. For example, if a participant decides to terminate employment (or is permanently laid off) before the participant is eligible for retirement, then any outstanding loan balance has to be paid immediately from a final distribution of income. If that distribution is not sufficient or the participant can not borrow the necessary amount from another source, any unpaid balance will be offset against the participant's vested plan account balance. The borrower will also be subject to an early withdrawal penalty of 10% and the amount setoff would be reported to the IRS and the State Department of Taxation as a premature distribution from the plan, triggering ordinary income. The plan administrator can not hold these accelerated notes and ignore the setoff rules, for that would be not be only be a breach of her fiduciary duties under the plan, but any such action could trigger a disqualification of the plan for all other plan participants. To suggest that this stringent regulatory pattern is nothing more than 'borrowing from oneself' or from 'settling an account' is, in this regulatory setting, outmoded. As the United States Supreme Court found in *Patterson v. Shumate*, 504 U.S. 753, 112 S.Ct. 2242, 119 L.Ed.2d 519 (1992), the pension plan is a separate entity from the plan participant. It should also be noted that in many instances, the maturity date of a pension loan precedes by many years the borrower's anticipated date of retirement or termination of

employment. There is no deferral of settling the plan account more than five years into the future when one has retired.

Secondly, in a very important functional sense, borrowing from one's pension fund is the equivalent (and surely no more blameworthy) of refinancing one's first mortgage and using the net loan proceeds to meet accrued unsecured debts. Consider how this example of refinancing would play out in a chapter 13 case. Suppose that one year before the debtor filed for chapter 13 relief, he refinanced his first mortgage—borrowing against his 'equity' in the property—and obtained the same amount in net proceeds after closing that he could have borrowed from his pension fund, and used the same net proceeds of sale to pay down accumulated unsecured debts. Then notwithstanding his efforts through this refinancing to manage his household finances, he has to file for relief under chapter 13.

Under the plan, the debtor proposes to continue paying his first mortgage under (or outside) the plan. Under what theory can the trustee object to the plan? The debtor has no right to repay his refinanced mortgage loan? That objection would be immediately rejected as absurd. Now what happens when the debtor pays down the principal of this loan? If the market is stable (or appreciating), the debtor will be building up his equity in an asset that may well be exempt from execution by his creditors as a matter of applicable state law. In several state jurisdictions, for example, Michigan, Texas, and Florida, the dollar amount of the exemption in the value of a primary residence or for property owned by tenancy by the entireties, i.e., by husband and wife, is unlimited. How is that any different in economic result than repaying a pension loan and rebuilding the debtor's equity in his pension plan which is also exempt from execution under federal and state law? In both cases, the unsecured creditors are 'prejudiced' by the repayment of these loans by the debtor 'to himself.'

### E. Solace for Moral Queasiness?

No matter how logically compelling our analysis may be based upon a careful reading of the definitional sections of the Code and upon a proper appreciation of nonrecourse secured claims, the moral sensibility of many judges at all levels of the federal judiciary remains offended by plans proposed by debtors like Mr. Buchferer. There is, however, a proper application of bankruptcy law that respects both the definitions and rules of construction of the Code as well as contemporary lending practices. If the trustee could establish that the pension loan at issue can be collaterally attacked as a fraudulent transfer, then we might have a different case under bankruptcy law. If, for example, the debtor used the loan proceeds to pay for an expensive vacation for his family to go skiing in the Swiss Alps, to go sunning on the Cote d' Azur, to pay off a book-maker on illegal gambling debts, or to buy his spouse or significant other a five karat diamond ring or full-length sable coat, etc., then the legitimacy of the loan transaction would be readily suspect. Or if the debtor used the proceeds of the loan for the primary purpose of acquiring assets otherwise exempt from execution at state law, then we might have to face a difficult issue. Was this sort of 'debtor estate planning' subject to avoidance as a fraudulent transfer? The debtor might raise as an affirmative defense that he was merely substituting one exempt asset for another. The only rub to this hypothetical would be the fact, underscored by the trustee, that to repay this obligation, the debtor would be using postpetition income. This also leaves aside the issue whether a standing chapter 13 trustee has the express statutory standing to avoid an alleged fraudulent transfer, an issue which this Court continues to view as unresolved.

There was, however, nothing in the prepetition history of this debtor that suggested that he borrowed from his pension fund for improper purposes. Absent an avoidance action, this loan obligation is valid and enforceable as a matter of applicable state and federal nonbankruptcy law. No court should deny enforceability to this loan in the context of a bankruptcy case upon a definitional gambit—"it is not a debt"—or upon a moral objection—"it is unfair to unsecured creditors."

### F. Confirmation subject to a Condition Subsequent.

In confirming the plan, the Court has, however, required the debtor to submit annu-

al financial statements to the trustee for his review of any material improvement in the debtors' financial condition, justifying an increase in payments to unsecured creditors from a greater disposable income under the modification provisions of section 1329. Mr. Buchferer admitted that he is eligible for retirement before the expiration of his sixty month plan; if he does retire as he is entitled to at age 55, he will enter into pay status under his pension and can work full-time at another job, subject to certain limitations not relevant to this opinion.

IV. Conclusion:

For the foregoing reasons, the trustee's objection is overruled, and the plan is confirmed, subject to the condition subsequent of the debtors' submitting sworn financial statements on May 1 of each year under the plan.

A separate order has been entered confirming the debtors' plan.